ARIZONA GOVERNING COMMITTEE FOR TAX
DEFERRED ANNUITY AND DEFERRED COM-
PENSATION PLANS ET AL. v. NORRIS

No. 82–52.  Argued March 28, 1983—Decided July 6, 1983

*John L. Endicott,* Special Assistant Attorney General of
Arizona, argued the cause for petitioners.  With him on the
briefs were *Robert K. Corbin,* Attorney General, and *John
L. Jones,* Assistant Attorney General.

*Amy Jo Gittler* argued the cause for respondent.  With
her on the brief was *Neal J. Beets.**

---

*Briefs of *amici curiae* urging reversal were filed by *Jim Smith,* At-
torney General, and *Mitchell D. Franks,* Assistant Attorney General, for
the State of Florida; by *Harry L. Dubrin, Jr.,* for the New York State
Teachers' Retirement System; by *Erwin N. Griswold, Jack H. Blaine,* and
*Edward J. Zimmerman* for the American Council of Life Insurance; by
*Robert E. Williams, Douglas S. McDowell,* and *Monte B. Lake* for the

PER CURIAM.

Petitioners in this case administer a deferred compensation plan for employees of the State of Arizona. The respondent class consists of all female employees who are enrolled in the plan or will enroll in the plan in the future. Certiorari was granted to decide whether Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. V), prohibits an employer from offering its employees the option of receiving retirement benefits from one of several companies selected by the employer, all of which pay lower monthly retirement benefits to a woman than to a man who has made the same contributions; and whether, if so, the relief awarded by the District Court was proper. 459 U. S. 904 (1982). The Court holds that this practice does constitute discrimination on the basis of sex in violation of Title VII, and that all retirement benefits derived from contributions made after the decision today must be cal-

Equal Employment Advisory Council; by *William R. Glendon, James B. Weidner,* and *James W. Paul* for the Teachers Insurance and Annuity Association et al.; and by *Spencer L. Kimball* for the National Association of Insurance Commissioners.

Briefs of *amici curiae* urging affirmance were filed by *Lawrence White, Woodley B. Osborne, Joy L. Koletsky, Ralph S. Spritzer,* and *John L. Pottenger, Jr.,* for the American Association of University Professors et al.; by *Mary L. Heen, Burt Neuborne, Isabelle Katz Pinzler, Joan E. Bertin,* and *Charles S. Sims* for the American Civil Liberties Union et al.; by *J. Albert Woll, Marsha Berzon, Laurence Gold,* and *Winn Newman* for the American Federation of Labor and Congress of Industrial Organizations et al.; by *Jonathan R. Harkavy, Edward W. Kriss,* and *Nahomi Harkavy* for the American Nurses' Association; by *Richard C. Dinkelspiel, Norman Redlich, William L. Robinson, Norman J. Chachkin, Beatrice Rosenberg, Richard T. Seymour, Jack Greenberg, James M. Nabrit III,* and *Barry L. Goldstein* for the Lawyers' Committee for Civil Rights Under Law et al.; and by *Robert A. Jablon* and *Ron M. Landsman* for the National Insurance Consumer Organization.

Briefs of *amici curiae* were filed by *Lawrence J. Latto, Stephen J. Hadley,* and *William D. Hager* for the American Academy of Actuaries; and by *Terry Rose Saunders* for Eight Individual Actuaries.

culated without regard to the sex of the beneficiary. This position is expressed in Parts I, II, and III of the opinion of JUSTICE MARSHALL, *post*, at this page and 1076–1091, which are joined by JUSTICE BRENNAN, JUSTICE WHITE, JUSTICE STEVENS, and JUSTICE O'CONNOR. The Court further holds that benefits derived from contributions made prior to this decision may be calculated as provided by the existing terms of the Arizona plan. This position is expressed in Part III of the opinion of JUSTICE POWELL, *post*, at 1105, which is joined by THE CHIEF JUSTICE, JUSTICE BLACKMUN, JUSTICE REHNQUIST, and JUSTICE O'CONNOR. Accordingly, the judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion. The Clerk is directed to issue the judgment August 1, 1983.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE WHITE, and JUSTICE STEVENS join, and with whom JUSTICE O'CONNOR joins as to Parts I, II, and III, concurring in the judgment in part.

In *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702 (1978), this Court held that Title VII of the Civil Rights Act of 1964 prohibits an employer from requiring women to make larger contributions in order to obtain the same monthly pension benefits as men. The question presented by this case is whether Title VII also prohibits an employer from offering its employees the option of receiving retirement benefits from one of several companies selected by the employer, all of which pay a woman lower monthly benefits than a man who has made the same contributions.

## I

### A

Since 1974 the State of Arizona has offered its employees the opportunity to enroll in a deferred compensation plan ad-

ministered by the Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans (Governing Committee). Ariz. Rev. Stat. Ann. § 38–871 *et seq.* (1974 and Supp. 1982–1983); Ariz. Regs. 2–9–01 *et seq.* (1975). Employees who participate in the plan may thereby postpone the receipt of a portion of their wages until retirement. By doing so, they postpone paying federal income tax on the amounts deferred until after retirement, when they receive those amounts and any earnings thereon.[1]

After inviting private companies to submit bids outlining the investment opportunities that they were willing to offer state employees, the State selected several companies to participate in its deferred compensation plan. Many of the companies selected offer three basic retirement options: (1) a single lump-sum payment upon retirement, (2) periodic payments of a fixed sum for a fixed period of time, and (3) monthly annuity payments for the remainder of the employee's life. When an employee decides to take part in the deferred compensation plan, he must designate the company in which he wishes to invest his deferred wages. Employees must choose one of the companies selected by the State to participate in the plan; they are not free to invest their deferred compensation in any other way. At the time an employee enrolls in the plan, he may also select one of the pay-out options offered by the company that he has chosen, but when he reaches retirement age he is free to switch to one of the company's other options. If at retirement the employee decides to receive a lump-sum payment, he may also purchase any of the options then being offered by the other companies participating in the plan. Many employees find an annuity contract to be the most attractive option, since receipt of a lump sum upon retirement requires payment of taxes on

---

[1] See 26 U. S. C. § 457 (1976 ed., Supp. V); Rev. Rul. 72–25, 1972–1 Cum. Bull. 127; Rev. Rul. 68–99, 1968–1 Cum. Bull 193; Rev. Rul. 60–31, 1960–1 Cum. Bull. 174. Arizona's deferred compensation program was approved by the Internal Revenue Service in 1974.

the entire sum in one year, and the choice of a fixed sum for a fixed period requires an employee to speculate as to how long he will live.

Once an employee chooses the company in which he wishes to invest and decides the amount of compensation to be deferred each month, the State is responsible for withholding the appropriate sums from the employee's wages and channelling those sums to the company designated by the employee. The State bears the cost of making the necessary payroll deductions and of giving employees time off to attend group meetings to learn about the plan, but it does not contribute any moneys to supplement the employees' deferred wages.

For an employee who elects to receive a monthly annuity following retirement, the amount of the employee's monthly benefits depends upon the amount of compensation that the employee deferred (and any earnings thereon), the employee's age at retirement, and the employee's sex. All of the companies selected by the State to participate in the plan use sex-based mortality tables to calculate monthly retirement benefits. App. 12. Under these tables a man receives larger monthly payments than a woman who deferred the same amount of compensation and retired at the same age, because the tables classify annuitants on the basis of sex and women on average live longer than men.[2] Sex is the only factor that the tables use to classify individuals of the same age; the tables do not incorporate other factors correlating with longevity such as smoking habits, alcohol consumption, weight, medical history, or family history. *Id.*, at 13.

---

[2] Different insurance companies participating in the plan use different means of classifying individuals on the basis of sex. Several companies use separate tables for men and women. Another company uses a single actuarial table based on male mortality rates, but calculates the annuities to be paid to women by using a 6-year "setback," *i. e.*, by treating a woman as if she were a man six years younger and had the life expectancy of a man that age. App. 12.

As of August 18, 1978, 1,675 of the State's approximately 35,000 employees were participating in the deferred compensation plan. Of these 1,675 participating employees, 681 were women, and 572 women had elected some form of future annuity option. As of the same date, 10 women participating in the plan had retired, and 4 of those 10 had chosen a lifetime annuity. *Id.*, at 6.

## B

On May 3, 1975, respondent Nathalie Norris, an employee in the Arizona Department of Economic Security, elected to participate in the plan. She requested that her deferred compensation be invested in the Lincoln National Life Insurance Co.'s fixed annuity contract. Shortly thereafter Arizona approved respondent's request and began withholding $199.50 from her salary each month.

On April 25, 1978, after exhausting administrative remedies, respondent brought suit in the United States District Court for the District of Arizona against the State, the Governing Committee, and several individual members of the Committee. Respondent alleged that the defendants were violating § 703(a) of Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U. S. C. § 2000e–2(a), by administering an annuity plan that discriminates on the basis of sex. Respondent requested that the District Court certify a class under Federal Rule of Civil Procedure 23(b)(2) consisting of all female employees of the State of Arizona "who are enrolled or will in the future enroll in the State Deferred Compensation Plan." Complaint ¶ V.

On March 12, 1980, the District Court certified a class action and granted summary judgment for the plaintiff class,[3] holding that the State's plan violates Title VII.[4] 486 F.

---

[3] The material facts concerning the State's deferred compensation plan were set forth in a statement of facts agreed to by all parties. *Id.*, at 4–13.

[4] Although the District Court concluded that the State's plan violates Title VII, the court went on to consider and reject respondent's separate claim that the plan violates the Equal Protection Clause of the Fourteenth

Supp. 645. The court directed petitioners to cease using sex-based actuarial tables and to pay retired female employees benefits equal to those paid to similarly situated men.[5] The United States Court of Appeals for the Ninth Circuit affirmed, with one judge dissenting. 671 F. 2d 330 (1982). We granted certiorari to decide whether the Arizona plan violates Title VII and whether, if so, the relief ordered by the District Court was proper. 459 U. S. 904 (1982).

## II

We consider first whether petitioners would have violated Title VII if they had run the entire deferred compensation plan themselves, without the participation of any insurance companies. Title VII makes it an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U. S. C. § 2000e–2(a)(1). There is no question that the opportunity to participate in a deferred compensation plan constitutes a "conditio[n] or privileg[e] of employment,"[6] and that retirement benefits constitute a form of "compensation."[7] The issue we must decide is whether it is discrimination "because of . . . sex" to pay a retired woman lower monthly benefits than a man who deferred the same amount of compensation.

---

Amendment. 486 F. Supp. 645, 651 (1980). Because respondent did not cross-appeal from this ruling, it was not passed on by the Court of Appeals and is not before us.

[5] The court subsequently denied respondent's motion to amend the judgment to include an award of retroactive benefits to retired female employees as compensation for the benefits they had lost because the annuity benefits previously paid them had been calculated on the basis of sex-segregated actuarial tables. Respondent did not appeal this ruling.

[6] See *Peters* v. *Missouri-Pacific R. Co.*, 483 F. 2d 490, 492, n. 3 (CA5), cert. denied, 414 U. S. 1002 (1973).

[7] See *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702, 712, n. 23 (1978).

In *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702 (1978), we held that an employer had violated Title VII by requiring its female employees to make larger contributions to a pension fund than male employees in order to obtain the same monthly benefits upon retirement. Noting that Title VII's "focus on the individual is unambiguous," *id.*, at 708, we emphasized that the statute prohibits an employer from treating some employees less favorably than others because of their race, religion, sex, or national origin. *Id.*, at 708–709. While women as a class live longer than men, *id.*, at 704, we rejected the argument that the exaction of greater contributions from women was based on a "factor other than sex"—*i. e.*, longevity—and was therefore permissible under the Equal Pay Act:[8]

---

[8] Section 703(h) of Title VII, the so-called Bennett Amendment, provides that Title VII does not prohibit an employer from "differentiat[ing] upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by [the Equal Pay Act]." 78 Stat. 257, 42 U. S. C. § 2000e–2(h).

The Equal Pay Act, 77 Stat. 56, 29 U. S. C. § 206(d), provides in pertinent part:

"(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

As in *Manhart, supra,* at 712, n. 23, we need not decide whether retirement benefits constitute "wages" under the Equal Pay Act, because the Bennett Amendment extends the four exceptions recognized in the Act to all forms of "compensation" covered by Title VII.

"[A]ny individual's life expectancy is based on a number of factors, of which sex is only one. . . . [O]ne cannot 'say that an actuarial distinction based entirely on sex is "based on any other factor than sex." Sex is exactly what it is based on.'" *Id.*, at 712–713, quoting *Manhart* v. *Los Angeles Dept. of Water & Power*, 553 F. 2d 581, 588 (CA9 1976), and the Equal Pay Act.

We concluded that a plan requiring women to make greater contributions than men discriminates "because of . . . sex" for the simple reason that it treats each woman "'in a manner which but for [her] sex would [have been] different.'" 435 U. S., at 711, quoting Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L. Rev. 1109, 1170 (1971).

We have no hesitation in holding, as have all but one of the lower courts that have considered the question,[9] that the classification of employees on the basis of sex is no more permissible at the pay-out stage of a retirement plan than at the pay-in stage.[10] We reject petitioners' contention that the

---

[9] See *Spirt* v. *Teachers Ins. & Annuity Assn.*, 691 F. 2d 1054 (CA2 1982), vacated and remanded, *post*, p. 1223; *Retired Public Employees' Assn. of California* v. *California*, 677 F. 2d 733 (CA9 1982), vacated and remanded, *post*, p. 1222; *Women in City Government United* v. *City of New York*, 515 F. Supp. 295 (SDNY 1981); *Hannahs* v. *New York State Teachers' Retirement System*, 26 FEP Cases 527 (SDNY 1981); *Probe* v. *State Teachers' Retirement System*, 27 FEP Cases 1306 (CD Cal. 1981), appeal docketed, Nos. 81–5865, 81–5866 (CA9 1981); *Shaw* v. *International Assn. of Machinists & Aerospace Workers*, 24 FEP Cases 995 (CD Cal. 1980). Cf. *EEOC* v. *Colby College*, 589 F. 2d 1139 (CA1 1978). See also 29 CFR § 1604.9(f) (1982) ("It shall be an unlawful employment practice for an employer to have a pension or retirement plan . . . which differentiates in benefits on the basis of sex").

Only the Sixth Circuit has reached the opposite conclusion. *Peters* v. *Wayne State University*, 691 F. 2d 235 (1981), vacated and remanded, *post*, p. 1223.

[10] It is irrelevant that female employees in *Manhart* were required to participate in the pension plan, whereas participation in the Arizona deferred compensation plan is voluntary. Title VII forbids all discrimination concerning "compensation, terms, conditions, or privileges of employ-

Arizona plan does not discriminate on the basis of sex because a woman and a man who defer the same amount of compensation will obtain upon retirement annuity policies having approximately the same present actuarial value.[11]   Arizona has simply offered its employees a choice among different levels of annuity benefits, any one of which, if offered alone, would be equivalent to the plan at issue in *Manhart*, where the employer determined both the monthly contributions employees were required to make and the level of benefits that they were paid.   If a woman participating in the Arizona plan wishes to obtain monthly benefits equal to those obtained by a man, she must make greater monthly contributions than he, just as the female employees in *Manhart* had to make greater contributions to obtain equal benefits.   For any particular level of benefits that a woman might wish to receive, she will have to make greater monthly contributions to obtain that level of benefits than a man would have to make.   The fact that Arizona has offered a range of discriminatory benefit levels, rather than only one such level, obviously provides no basis whatsoever for distinguishing *Manhart*.

ment," not just discrimination concerning those aspects of the employment relationship as to which the employee has no choice.   It is likewise irrelevant that the Arizona plan includes two options—the lump-sum option and the fixed-sum-for-a-fixed-period option—that are provided on equal terms to men and women.   An employer that offers one fringe benefit on a discriminatory basis cannot escape liability because he also offers other benefits on a nondiscriminatory basis.   Cf. *Mississippi University for Women v. Hogan*, 458 U. S. 718, 723–724, n. 8 (1982).

[11] The present actuarial value of an annuity policy is determined by multiplying the present value (in this case, the value at the time of the employee's retirement) of each monthly payment promised by the probability, which is supplied by an actuarial table, that the annuitant will live to receive that payment.   An annuity policy issued to a retired female employee under a sex-based retirement plan will have roughly the same present actuarial value as a policy issued to a similarly situated man, since the lower value of each monthly payment she is promised is offset by the likelihood that she will live longer and therefore receive more payments.

In asserting that the Arizona plan is nondiscriminatory because a man and a woman who have made equal contributions will obtain annuity policies of roughly equal present actuarial value, petitioners incorrectly assume that Title VII permits an employer to classify employees on the basis of sex in predicting their longevity. Otherwise there would be no basis for postulating that a woman's annuity policy has the same present actuarial value as the policy of a similarly situated man even though her policy provides lower monthly benefits.[12] This underlying assumption—that sex may properly be used to predict longevity—is flatly inconsistent with the basic teaching of *Manhart:* that Title VII requires employers to treat their employees as *individuals*, not "as simply components of a racial, religious, sexual, or national class." 435 U. S., at 708. *Manhart* squarely rejected the notion that, because women as a class live longer than men, an employer may adopt a retirement plan that treats every individual woman less favorably than every individual man. *Id.*, at 716–717.

As we observed in *Manhart*, "[a]ctuarial studies could unquestionably identify differences in life expectancy based on race or national origin, as well as sex." *Id.*, at 709 (footnote omitted). If petitioners' interpretation of the statute were correct, such studies could be used as a justification for paying employees of one race lower monthly benefits than employees of another race. We continue to believe that "a statute that was designed to make race irrelevant in the employment market," *ibid.*, citing *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 436 (1971), could not reasonably be construed to permit such a racial classification. And if it would be unlawful to use race-based actuarial tables, it must also be unlawful to use sex-based tables, for under Title VII a distinction

---

[12] See *Spirt* v. *Teachers Ins. & Annuity Assn.*, *supra*, at 1061–1062; Brilmayer, Hekeler, Laycock, & Sullivan, Sex Discrimination in Employer-Sponsored Insurance Plans: A Legal and Demographic Analysis, 47 U. Chi. L. Rev. 505, 512–514 (1980).

based on sex stands on the same footing as a distinction based on race unless it falls within one of a few narrow exceptions that are plainly inapplicable here.[13]

What we said in *Manhart* bears repeating: "Congress has decided that classifications based on sex, like those based on national origin or race, are unlawful." 435 U. S., at 709. The use of sex-segregated actuarial tables to calculate retirement benefits violates Title VII whether or not the tables reflect an accurate prediction of the longevity of women as a class, for under the statute "[e]ven a true generalization about [a] class" cannot justify class-based treatment.[14] *Id.*,

---

[13] The exception for bona fide occupational qualifications, 42 U. S. C. § 2000e–2(e), is inapplicable since the terms of a retirement plan have nothing to do with occupational qualifications. The only possible relevant exception recognized in the Bennett Amendment, see n. 8, *supra*, is inapplicable in this case for the same reason it was inapplicable in *Manhart:* a scheme that uses sex to predict longevity is based on sex; it is not based on "any other factor other than sex." See 435 U. S., at 712 ("any individual's life expectancy is based on any number of factors, of which sex is only one").

[14] In his separate opinion in *Manhart*, JUSTICE BLACKMUN expressed doubt that that decision could be reconciled with this Court's previous decision in *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976). In *Gilbert* a divided Court held that the exclusion of pregnancy from an employer's disability benefit plan did not constitute discrimination "because of . . . sex" within the meaning of Title VII. The majority reasoned that the special treatment of pregnancy distinguished not between men and women, but between pregnant women and nonpregnant persons of both sexes. *Id.*, at 135. The dissenters in *Gilbert* asserted that "it offends common sense to suggest that a classification revolving around pregnancy is not, at the minimum, strongly 'sex related,'" *id.*, at 149 (BRENNAN, J., dissenting) (citation omitted), and that the special treatment of pregnancy constitutes sex discrimination because "it is the capacity to become pregnant which primarily differentiates the female from the male." *Id.*, at 162 (STEVENS, J., dissenting).

The tension in our cases that JUSTICE BLACKMUN noted in *Manhart* has since been eliminated by the enactment of the Pregnancy Discrimination Act of 1978 (PDA), Pub. L. 95–555, 92 Stat. 2076, in which Congress overruled *Gilbert* by amending Title VII to establish that "[t]he terms 'because of sex' or 'on the basis of sex' include . . . because of or on the basis of

at 708.   An individual woman may not be paid lower monthly benefits simply because women as a class live longer than men.[15]   Cf. *Connecticut* v. *Teal*, 457 U. S. 440 (1982) (an

pregnancy, childbirth, or related medical conditions." 42 U. S. C. § 2000e (k) (1976 ed., Supp. V).   See *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669 (1983).

The enactment of the PDA buttresses our holding in *Manhart* that the greater cost of providing retirement benefits for women as a class cannot justify differential treatment based on sex.   435 U. S., at 716–717.   JUS-TICE REHNQUIST's opinion for the Court in *Gilbert* relied heavily on the absence of proof that the employer's disability program provided less coverage for women as a class than for men.   429 U. S., at 138–139.   In enacting the PDA, Congress recognized that requiring employers to cover pregnancy on the same terms as other disabilities would add approximately $200 million to their total costs, but concluded that the PDA was necessary "to clarify [the] original intent" of Title VII.   H. R. Rep. No. 95–948, pp. 4, 9 (1978).   Since the purpose of the PDA was simply to make the treatment of pregnancy consistent with general Title VII principles, see *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, *supra*, at 678–679, 680–681, Congress' decision to forbid special treatment of pregnancy despite the special costs associated therewith provides further support for our conclusion in *Manhart* that the greater costs of providing retirement benefits for female employees does not justify the use of a sex-based retire-ment plan.   Cf. 462 U. S., at 685, n. 26.   See also 29 CFR § 1604.9(e) (1982) ("It shall not be a defense under Title VII to a charge of sex dis-crimination in benefits that the cost of such benefits is greater with respect to one sex than the other").

[15] As we noted in *Manhart*, "insurance is concerned with events that are individually unpredictable, but that is characteristic of many employment decisions" and has never been deemed a justification for "resort to classifi-cations proscribed by Title VII."   435 U. S., at 710.   It is true that prop-erly designed tests can identify many job qualifications before employment, whereas it cannot be determined in advance when a particular employee will die.   See *id.*, at 724 (BLACKMUN, J., concurring in part and concurring in judgment).   For some jobs, however, there may be relevant skills that cannot be identified by testing.   Yet Title VII clearly would not permit use of race, national origin, sex, or religion as a proxy for such an employ-ment qualification, regardless of whether a statistical correlation could be established.

There is no support in either logic or experience for the view, referred to by JUSTICE POWELL, *post*, at 1098, that an annuity plan must classify on the basis of sex to be actuarially sound.   Neither Title VII nor the Equal Pay

individual may object that an employment test used in making promotion decisions has a discriminatory impact even if the class of which he is a member has not been disproportionately denied promotion).

We conclude that it is just as much discrimination "because of . . . sex" to pay a woman lower benefits when she has made the same contributions as a man as it is to make her pay larger contributions to obtain the same benefits.

## III

Since petitioners plainly would have violated Title VII if they had run the entire deferred compensation plan themselves, the only remaining question as to liability is whether their conduct is beyond the reach of the statute because it is the companies chosen by petitioners to participate in the plan that calculate and pay the retirement benefits.

Title VII "primarily govern[s] relations between employees and their employer, not between employees and third parties." [16] *Manhart*, 435 U. S., at 718, n. 33. Recognizing this limitation on the reach of the statute, we noted in *Manhart* that

> "[n]othing in our holding implies that it would be unlawful for an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command in the open market." *Id.*, at 717–718 (footnote omitted).

Act "makes it unlawful to determine the funding requirements for an establishment's benefit plan by considering the [sexual] composition of the entire force," *Manhart*, 435 U. S., at 718, n. 34, and it is simply not necessary either to exact greater contributions from women than from men or to pay women lower benefits than men. For example, the Minnesota Mutual Life Insurance Co. and the Northwestern National Life Insurance Co. have offered an annuity plan that treats men and women equally. See The Chronicle of Higher Education, Vol. 25, No. 7, Oct. 13, 1982, pp. 25–26.

[16] The statute applies to employers and "any agent" of an employer. 42 U. S. C. § 2000e(b).

Relying on this caveat, petitioners contend that they have not violated Title VII because the life annuities offered by the companies participating in the Arizona plan reflect what is available in the open market. Petitioners cite a statement in the stipulation of facts entered into in the District Court that "[a]ll tables presently in use provide a larger sum to a male than to a female of equal age, account value and any guaranteed payment period." App. 10.[17]

[17] Petitioners also emphasize that an employee participating in the Arizona plan can elect to receive a lump-sum payment upon retirement and then "purchase the largest benefit which his or her accumulated contributions could command in the open market." Brief for Petitioners 3. The fact that the lump-sum option permits this has no bearing, however, on whether petitioners have discriminated because of sex in offering an annuity option to its employees. As we have pointed out in n. 10, *supra*, it is no defense to discrimination in the provision of a fringe benefit that another fringe benefit is provided on a nondiscriminatory basis.

Although petititioners contended in the Court of Appeals that their conduct was exempted from the reach of Title VII by the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 *et seq.*, they have made no mention of the Act in either their petition for certiorari or their brief on the merits. "[O]nly in the most exceptional cases will we consider issues not raised in the petition," *Stone* v. *Powell*, 428 U. S. 465, 481, n. 15 (1976); see this Court's Rule 21.1(a), and but for the discussion of the question by JUSTICE POWELL we would have seen no reason to address a contention that petitioners deliberately chose to abandon after it was rejected by the Court of Appeals.

Since JUSTICE POWELL relies on the Act, however, *post*, at 1099–1102, we think it is appropriate to lay the matter to rest. The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance." 15 U. S. C. § 1012(b). Although there are no reported Arizona cases indicating the effect of the Arizona statute cited by JUSTICE POWELL on classifications based on sex in annuity policies, we may assume that the statute would permit such classifications, for that assumption does not affect our conclusion that the application of Title VII in this case does not supersede the application of any state law regulating "the business of insurance." As the Court of Appeals explained, 671 F. 2d 330, 333 (1982), the plaintiff class in this case has not challenged the conduct of the business of insurance. No insurance company has been joined

It is no defense that all annuities immediately available in the open market may have been based on sex-segregated actuarial tables. In context it is reasonably clear that the stipulation on which petitioners rely means only that all the tables used by the companies taking part in the Arizona plan are based on sex,[18] but our conclusion does not depend upon whether petitioners' construction of the stipulation is accepted or rejected. It is irrelevant whether any other insurers offered annuities on a sex-neutral basis, since the State did not simply set aside retirement contributions and let employees purchase annuities on the open market. On the contrary, the State provided the opportunity to obtain an annu-

as a defendant, and our judgment will in no way preclude any insurance company from offering annuity benefits that are calculated on the basis of sex-segregated actuarial tables. All that is at issue in this case is *an employment practice:* the practice of offering a male employee the opportunity to obtain greater monthly annuity benefits than could be obtained by a similarly situated female employee. It is this conduct of the employer that is prohibited by Title VII. By its own terms, the McCarran-Ferguson Act applies only to the business of insurance and has no application to employment practices. Arizona plainly is not itself involved in the business of insurance, since it has not underwritten any risks. See *Union Labor Life Ins. Co.* v. *Pireno,* 458 U. S. 119, 133 (1982) (McCarran-Ferguson Act was "intended primarily to protect '*intra*-industry cooperation' in the underwriting of risks") (emphasis in original), quoting *Group Life & Health Ins. Co.* v. *Royal Drug Co.,* 440 U. S. 205, 221 (1979); *SEC* v. *Variable Annuity Life Ins. Co.,* 359 U. S. 65, 71 (1959) ("the concept of 'insurance' [for purposes of the McCarran-Ferguson Act] involves some investment risk-taking on the part of the company"). Because the application of Title VII in this case does not supersede any state law governing the business of insurance, see *Spirt* v. *Teachers Ins. & Annuity Assn.,* 691 F. 2d, at 1064; *EEOC* v. *Wooster Brush Co.,* 523 F. Supp. 1256, 1266 (ND Ohio 1981), we need not decide whether Title VII "specifically relates to the business of insurance" within the meaning of the McCarran-Ferguson Act. Cf. *Women in City Government United* v. *City of New York,* 515 F. Supp., at 302–306.

[18] This is the natural reading of the statement, since it appears in the portion of the stipulation discussing the options offered by the companies participating in the State's plan.

ity as part of its own deferred compensation plan. It invited insurance companies to submit bids outlining the terms on which they would supply retirement benefits[19] and selected the companies that were permitted to participate in the plan. Once the State selected these companies, it entered into contracts with them governing the terms on which benefits were to be provided to employees. Employees enrolling in the plan could obtain retirement benefits only from one of those companies, and no employee could be contacted by a company except as permitted by the State. Ariz. Regs. 2–9–06.A, 2–9–20.A (1975).

Under these circumstances there can be no serious question that petitioners are legally responsible for the discriminatory terms on which annuities are offered by the companies chosen to participate in the plan. Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the State, the State cannot disclaim responsibility for the discriminatory features of the insurers' options.[20] Since employers are ultimately responsible for the "compensation, terms, conditions, [and] privileges of employment" provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination.[21] In

---

[19] The State's contract procurement documents asked the bidders to quote annuity rates for men and women.

[20] See *Peters* v. *Wayne State University*, 691 F. 2d, at 238; *EEOC* v. *Colby College*, 589 F. 2d, at 1141; Van Alstyne, Equality for Individuals or Equality for Groups: Implications of the Supreme Court Decision in the Manhart Case, 64 AAUP Bulletin 150, 152–155 (1978).

[21] An analogy may usefully be drawn to our decision in *Ford Motor Co.* v. *NLRB*, 441 U. S. 488 (1979). The employer in that case provided in-plant food services to its employees under a contract with an independent caterer. We held that the prices charged for the food constituted "terms and conditions of employment" under the National Labor Relations Act (NLRA)

this case the State of Arizona was itself a party to contracts concerning the annuities to be offered by the insurance companies, and it is well established that both parties to a discriminatory contract are liable for any discriminatory provisions the contract contains, regardless of which party initially suggested inclusion of the discriminatory provisions.[22] It would be inconsistent with the broad remedial purposes of Title VII[23] to hold that an employer who adopts a discrimina-

and were therefore mandatory subjects for collective bargaining. We specifically rejected the employer's argument that, because the food was provided by a third party, the prices did not implicate " 'an aspect of the relationship between the employer and employees.' " *Id.*, at 501, quoting *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 178 (1971). We emphasized that the selection of an independent contractor to provide the food did not change the fact that "the matter of in-plant food prices and services is an aspect of the relationship between Ford and its own employees." 441 U. S., at 501.

Just as the issue in *Ford* was whether the employer had refused to bargain with respect to "terms and conditions of employment," 29 U. S. C. § 158(d), the issue here is whether petitioners have discriminated against female employees with respect to "compensation, terms, conditions, or privileges of employment." Even more so than in-plant food prices, retirement benefits are matters "of deep concern" to employees, *id.*, at 498, and plainly constitute an aspect of the employment relationship. Indeed, in *Ford* we specifically compared in-plant food services to "other kinds of benefits, such as health insurance, implicating outside suppliers." *Id.*, at 503, n. 15. We do not think it makes any more difference here than it did in *Ford* that the employer engaged third parties to provide a particular benefit rather than directly providing the benefit itself.

[22] See *Williams* v. *New Orleans Steamship Assn.*, 673 F. 2d 742, 750–751 (CA5 1982), cert. denied, 460 U. S. 1038 (1983); *Williams* v. *Owens-Illinois, Inc.*, 665 F. 2d 918, 926 (CA9), modified and rehearing denied, 28 FEP Cases 1820, cert. denied, 459 U. S. 971 (1982); *Farmer* v. *ARA Services, Inc.*, 660 F. 2d 1096, 1104 (CA6 1981); *Grant* v. *Bethlehem Steel Corp.*, 635 F. 2d 1007, 1014 (CA2 1980), cert. denied, 452 U. S. 940 (1981); *United States* v. *N. L. Industries, Inc.*, 479 F. 2d 354, 379–380 (CA8 1973); *Robinson* v. *Lorillard Corp.*, 444 F. 2d 791, 799 (CA4), cert. dism'd, 404 U. S. 1006 (1971).

[23] See *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 417–418, 421 (1975); *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–430 (1971).

tory fringe-benefit plan can avoid liability on the ground that he could not find a third party willing to treat his employees on a nondiscriminatory basis.[24]   An employer who confronts such a situation must either supply the fringe benefit himself, without the assistance of any third party, or not provide it at all.

## IV

We turn finally to the relief awarded by the District Court. The court enjoined petitioners to assure that future annuity payments to retired female employees shall be equal to the payments received by similarly situated male employees.[25]

In *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975), we emphasized that one of the main purposes of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.*, at 418.   We recognized that there is a strong presumption that "'[t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.'" *Id.*, at 418–419, quoting *Wicker* v. *Hoppock*, 6 Wall. 94, 99 (1867).   Once a violation of the statute has been found, retroactive relief "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through

---

[24] Such a result would be particularly anomalous where, as here, the employer made no effort to determine whether third parties would provide the benefit on a neutral basis.   Contrast The Chronicle of Higher Education, *supra* n. 15, at 25–26 (explaining how the University of Minnesota obtained agreements from two insurance companies to use sex-neutral annuity tables to calculate annuity benefits for its employees).   Far from bargaining for sex-neutral treatment of its employees, Arizona asked companies seeking to participate in its plan to list their annuity rates for men and women separately.

[25] The court did not explain its reasons for choosing this remedy.

Since respondent did not appeal the District Court's refusal to award damages for benefit payments made prior to the court's decision, see n. 5, *supra*, there is no need to consider the correctness of that ruling.

past discrimination." 422 U. S., at 421 (footnote omitted). Applying this standard, we held that the mere absence of bad faith on the part of the employer is not a sufficient reason for denying such relief. *Id.*, at 422–423.

Although this Court noted in *Manhart* that "[t]he *Albemarle* presumption in favor of retroactive liability can seldom be overcome," 435 U. S., at 719, the Court concluded that under the circumstances the District Court had abused its discretion in requiring the employer to refund to female employees all contributions they were required to make in excess of the contributions demanded of men. The Court explained that "conscientious and intelligent administrators of pension funds, who did not have the benefit of the extensive briefs and arguments presented to us, may well have assumed that a program like the Department's was entirely lawful," since "[t]he courts had been silent on the question, and the administrative agencies had conflicting views." *Id.*, at 720 (footnote omitted). The Court also noted that retroactive relief based on "[d]rastic changes in the legal rules governing pension and insurance funds" can "jeopardiz[e] the insurer's solvency and, ultimately, the insureds' benefits," *id.*, at 721, and that the burden of such relief can fall on innocent third parties. *Id.*, at 722–723.

While the relief ordered here affects only benefit payments made after the date of the District Court's judgment, it does not follow that the relief is wholly prospective in nature, as an injunction concerning future conduct ordinarily is, and should therefore be routinely awarded once liability is established. When a court directs a change in benefits based on contributions made before the court's order, the court is awarding relief that is fundamentally retroactive in nature. This is true because retirement benefits under a plan such as that at issue here represent a return on contributions which were made during the employee's working years and which were intended to fund the benefits without any additional contributions from any source after retirement.

A recognition that the relief awarded by the District Court is partly retroactive is only the beginning of the inquiry. Absent special circumstances a victim of a Title VII violation is entitled to whatever retroactive relief is necessary to undo any damage resulting from the violation. See *Albemarle Paper Co.* v. *Moody, supra,* at 418–419, 421. As to any disparity in benefits that is attributable to contributions made after our decision in *Manhart,* there are no special circumstances justifying the denial of retroactive relief. Our ruling today was clearly foreshadowed by *Manhart.* That decision should have put petitioners on notice that a man and a woman who make the same contributions to a retirement plan must be paid the same monthly benefits.[26] To the extent that any disparity in benefits coming due after the date of the District Court's judgment is attributable to contributions made after *Manhart,* there is therefore no unfairness in requiring petitioners to pay retired female employees whatever sum is necessary each month to bring them up to the benefit level that they would have enjoyed had their post-*Manhart* contributions been treated in the same way as those of similarly situated male employees.

To the extent, however, that the disparity in benefits that the District Court required petitioners to eliminate is attrib-

---

[26] Only one of the several lower court decisions since *Manhart* has accepted the argument that the principle established in that decision is limited to plans that require women to make greater contributions than men, see n. 9, *supra,* and no court has held that an employer can assert as a defense that the calculation and payment of retirement benefits is made by third parties selected by the employer. See also Van Alstyne, *supra* n. 20, at 152–155 (predicting that the involvement of an independent insurer would not be recognized as a defense and noting that an employer offering a sex-based retirement plan funded by such an insurer would be well advised to act expeditiously to bring himself into compliance with the law). After *Manhart* an employer could not reasonably have assumed that a sex-based plan would be lawful. As explained *supra,* at 1088–1089, Arizona did not simply set aside wages and permit employees to purchase annuities in the open market; it therefore had no basis for assuming that the open-market exception recognized in *Manhart* would apply to its plan.

utable to contributions made before *Manhart*, the court gave insufficient attention to this Court's recognition in *Manhart* that until that decision the use of sex-based tables might reasonably have been assumed to be lawful. Insofar as this portion of the disparity is concerned, the District Court should have inquired into the circumstances in which petitioners, after *Manhart*, could have applied sex-neutral tables to the pre-*Manhart* contributions of a female employee and a similarly situated male employee without violating any contractual rights that the latter might have had on the basis of his pre-*Manhart* contributions. If, in the case of a particular female employee and a similarly situated male employee, petitioners could have applied sex-neutral tables to pre-*Manhart* contributions without violating any contractual right of the male employee, they should have done so in order to prevent further discrimination in the payment of retirement benefits in the wake of this Court's ruling in *Manhart*.[27] Since a female employee in this situation should have had sex-neutral tables applied to her pre-*Manhart* contributions, it is only fair that petitioners be required to supplement any benefits coming due after the District Court's judgment by whatever sum is necessary to compensate her for their failure to adopt sex-neutral tables.

If, on the other hand, sex-neutral tables could not have been applied to the pre-*Manhart* contributions of a particular female employee and any similarly situated male employee without violating the male employee's contractual rights, it would be inequitable to award such relief. To do so would be

---

[27] Since the actual calculation and payment of retirement benefits was in the hands of third parties under the Arizona plan, petitioners would not automatically have been able to apply sex-neutral tables to pre-*Manhart* contributions even if pre-existing contractual rights posed no obstacle. However, petitioners were in a position to exert influence on the companies participating in the plan, which depended upon the State for the business generated by the deferred compensation plan, and we see no reason why petitioners should stand in a better position because they engaged third parties to pay the benefits than they would be in had they run the entire plan themselves.

to require petitioners to compensate the female employee for a disparity attributable to pre-*Manhart* conduct even though such conduct might reasonably have been assumed to be lawful and petitioners could not have done anything after *Manhart* to eliminate that disparity short of expending state funds. With respect to any female employee determined to fall in this category, petitioners need only ensure that her monthly benefits are no lower than they would have been had her post-*Manhart* contributions been treated in the same way as those of a similarly situated male employee.

The record does not indicate whether some or all of the male participants in the plan who had not retired at the time *Manhart* was decided[28] had any contractual right to a particular level of benefits that would have been impaired by the application of sex-neutral tables to their pre-*Manhart* contributions. The District Court should address this question on remand.

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE BLACKMUN, and JUSTICE REHNQUIST join, dissenting in part and concurring in part, and with whom JUSTICE O'CONNOR joins as to Part III.

The Court today holds that an employer may not offer its employees life annuities from a private insurance company that uses actuarially sound, sex-based mortality tables. This holding will have a far-reaching effect on the operation of insurance and pension plans. Employers may be forced to discontinue offering life annuities, or potentially disruptive changes may be required in long-established methods of calculating insurance and pensions.[1] Either course will work a

---

[28] Since the amount of monthly annuity payments is ordinarily fixed by the time of retirement, sex-neutral tables presumably could not have been applied after *Manhart* to male employees who had retired before that decision without violating their contractual rights.

[1] The cost of continuing to provide annuities may become prohibitive. The *minimum* additional cost necessary to equalize benefits prospectively would range from $85 to $93 million each year for at least the next 15 years. U. S. Dept. of Labor, Cost Study of the Impact of an Equal Benefits Rule

major change in the way the cost of insurance is determined—to the probable detriment of *all* employees. This is contrary to our explicit recognition in *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702, 717 (1978), that Title VII "was [not] intended to revolutionize the insurance and pension industries."

I

The State of Arizona provides its employees with a voluntary pension plan that allows them to defer receipt of a portion of their compensation until retirement. If an employee chooses to participate, an amount designated by the employee is withheld from each paycheck and invested by the State on the employee's behalf. When an employee retires, he or she may receive the amount that has accrued in one of three ways. The employee may withdraw the total amount accrued, arrange for periodic payments of a fixed sum for a fixed time, or use the accrued amount to purchase a life annuity.

There is no contention that the State's plan discriminates between men and women when an employee contributes to the fund. The plan is voluntary and each employee may contribute as much as he or she chooses. Nor does anyone contend that either of the first two methods of repaying the accrued amount at retirement is discriminatory. Thus, if Arizona had adopted the same contribution plan but provided only the first two repayment options, there would be no dispute that its plan complied with Title VII of the Civil Rights

---

on Pension Benefits 4 (1983) (hereinafter Department of Labor Cost Study). This minimum cost assumes that employers will be free to use the least costly method of adjusting benefits. This assumption may be unfounded. If employers are required to "top up" benefits—*i. e.*, calculate women's benefits at the rate applicable to men rather than apply a unisex rate to both men and women—the cost of providing purely prospective benefits would range from $428 to $676 million each year for at least the next 15 years. *Id.*, at 31. No one seriously suggests that these costs will not be passed on—in large part—to the annuity beneficiaries or, in the case of state and local governments, to the public.

Act of 1964, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. V). The first two options, however, have disadvantages. If an employee chooses to take a lump-sum payment, the tax liability will be substantial.[2] The second option ameliorates the tax problem by spreading the receipt of the accrued amount over a fixed period of time. This option, however, does not guard against the possibility that the finite number of payments selected by the employee will fail to provide income for the remainder of his or her life.

The third option—the purchase of a life annuity—resolves both of these problems. It reduces an employee's tax liability by spreading the payments out over time, and it guarantees that the employee will receive a stream of payments for life. State law prevents Arizona from accepting the financial uncertainty of funding life annuities. Ariz. Rev. Stat. Ann. § 38–871(C)(1) (Supp. 1982–1983). But to achieve tax benefits under federal law, the life annuity must be purchased from a company designated by the retirement plan. Rev. Rul. 72–25, 1972–1 Cum. Bull. 127; Rev. Rul. 68–99, 1968–1 Cum. Bull 193. Accordingly, Arizona contracts with private insurance companies to make life annuities available to its employees. The companies that underwrite the life annuities, as do the vast majority of private insurance companies in the United States, use sex-based mortality tables. Thus, the only effect of Arizona's third option is to allow its employees to purchase at a tax saving the same annuities they otherwise would purchase on the open market.

The Court holds that Arizona's voluntary plan violates Title VII. In the majority's view, Title VII requires an employer to follow one of three courses. An employer must provide unisex annuities itself, contract with insurance companies to provide such annuities, or provide no annuities to its employees. *Ante,* at 1091 (MARSHALL, J., concurring in judgment in part). The first option is largely illusory. Most

---

[2] The employee will be required to include the entire amount received as income. See 26 U. S. C. § 457 (1976 ed., Supp. V); Rev. Rul. 68–99, 1968–1 Cum. Bull 193.

employers do not have either the financial resources or administrative ability to underwrite annuities. Or, as in this case, state law may prevent an employer from providing annuities. If unisex annuities are available, an employer may contract with private insurance companies to provide them. It is stipulated, however, that the insurance companies with which Arizona contracts do not provide unisex annuities, nor do insurance companies generally underwrite them. The insurance industry either is prevented by state law from doing so[3] or it views unisex mortality tables as actuarially unsound. An employer, of course, may choose the third option. It simply may decline to offer its employees the right to purchase annuities at a substantial tax saving. It is difficult to see the virtue in such a compelled choice.

## II

As indicated above, the consequences of the Court's holding are unlikely to be beneficial. If the cost to employers of offering unisex annuities is prohibitive or if insurance carriers choose not to write such annuities, employees will be denied the opportunity to purchase life annuities—concededly the most advantageous pension plan—at lower cost.[4] If, alternatively, insurance carriers and employers choose to offer these annuities, the heavy cost burden of equalizing benefits probably will be passed on to current employees. There is

[3] See Cal. Ins. Code Ann. § 790.03(f) (West Supp. 1983) (requiring differentials based on the sex of the individual insured); *Spirt* v. *Teachers Insurance & Annuity Assn.*, 691 F. 2d 1054, 1066 (CA2 1982) (noting that State of New York has disapproved certain uses of unisex rates), vacated and remanded, *post*, p. 1223.

[4] This is precisely what has happened in this case. Faced with the liability resulting from the Court of Appeals' judgment, the State of Arizona discontinued making life annuities available to its employees. Tr. of Oral Arg. 8. Any employee who now wishes to have the security provided by a life annuity must withdraw his or her accrued retirement savings from the state pension plan, pay federal income tax on the amount withdrawn, and then use the remainder to purchase an annuity on the open market—which most likely will be sex-based. The adverse effect of today's holding apparently will fall primarily on the State's employees.

no evidence that Congress intended Title VII to work such a change. Nor does *Manhart* support such a sweeping reading of this statute. That case expressly recognized the limited reach of its holding—a limitation grounded in the legislative history of Title VII and the inapplicability of Title VII's policies to the insurance industry.

A

We were careful in *Manhart* to make clear that the question before us was narrow. We stated: "All that is at issue today is a requirement that men and women make unequal contributions to an *employer-operated* pension fund." 435 U. S., at 717 (emphasis added). And our holding was limited expressly to the precise issue before us. We stated that "[a]lthough we conclude that the Department's practice violated Title VII, we do not suggest that the statute was intended to revolutionize the insurance and pension industries." *Ibid.*

The Court in *Manhart* had good reason for recognizing the narrow reach of Title VII in the particular area of the insurance industry. Congress has chosen to leave the primary responsibility for regulating the insurance industry to the respective States. See McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 *et seq.*[5] This Act reflects the

---

[5] When this Court held for the first time that the Federal Government had the power to regulate the business of insurance, see *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944) (holding the antitrust laws applicable to the business of insurance), Congress responded by passing the McCarran-Ferguson Act. As initially proposed, the Act had a narrow focus. It would have provided only: " 'That nothing contained in the Act of July 2, 1890, as amended, known as the Sherman Act, or the Act of October 15, 1914, as amended, known as the Clayton Act, shall be construed to apply to the business of insurance or to acts in the conduct of that business or in any wise to impair the regulation of that business by the several States.' " S. Rep. No. 1112, 78th Cong., 2d Sess., pt. 1, p. 2 (1944) (quoting proposed Act). This narrow version, however, was not accepted.

Congress subsequently proposed and adopted a much broader bill. It recognized, as it previously had, the need to accommodate federal antitrust

long-held view that the "continued regulation . . . by the several States of the business of insurance is in the public interest." 15 U. S. C. § 1011; see *SEC* v. *National Securities, Inc.*, 393 U. S. 453, 458–459 (1969). Given the consistent policy of entrusting insurance regulation to the States, the majority is not justified in assuming that Congress intended in 1964 to require the industry to change longstanding actuarial methods, approved over decades by state insurance commissions.[6]

---

laws and state regulation of insurance. See H. R. Rep. No. 143, 79th Cong., 1st Sess., 3 (1945). But it also recognized that the decision in *South-Eastern Underwriters Assn.* had raised questions as to the general validity of state laws governing the business of insurance. Some insurance carriers were reluctant to comply with state regulatory authority, fearing liability for their actions. See H. R. Rep. No. 143, at 2. Congress thus enacted broad legislation "so that the several States may know that the Congress desires to protect the continued regulation . . . of the business of insurance by the several States." *Ibid.*

The McCarran-Ferguson Act, as adopted, accordingly commits the regulation of the insurance industry presumptively to the States. The introduction to the Act provides that "silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of [the] business [of insurance] by the several States." 15 U. S. C. § 1011. Section 2(b) of the Act further provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U. S. C. § 1012(b).

[6] Most state laws regulating insurance and annuities explicitly proscribe "unfair discrimination between individuals in the same class." Bailey, Hutchinson, & Narber, The Regulatory Challenge to Life Insurance Classification, 25 Drake L. Rev. 779, 783 (1976) (emphasis omitted). Arizona insurance law similarly provides that there shall be "[no] unfair discrimination between individuals of the same class." Ariz. Rev. Stat. Ann. § 20–448 (Supp. 1982–1983). Most States, including Arizona, have determined that the use of actuarially sound, sex-based mortality tables comports with this state definition of discrimination. Given the provision of the McCarran-Ferguson Act that Congress intends to supersede state insurance regulation only when it enacts laws that "specifically relat[e] to the business of insurance," see n. 5, *supra*, the majority offers no satisfactory

Nothing in the language of Title VII supports this pre-emption of state jurisdiction. Nor has the majority identi-fied any evidence in the legislative history that Congress con-

reason for concluding that Congress intended Title VII to pre-empt this important area of state regulation.

The majority states that the McCarran-Ferguson Act is not relevant because the petitioners did not raise the issue in their brief. See *ante*, at 1087–1088, n. 17 (MARSHALL, J., concurring in judgment in part). This misses the point. The question presented is whether Congress intended Title VII to prevent employers from offering their employees—pursuant to state law—actuarially sound, sex-based annuities. The McCarran-Ferguson Act is explicitly relevant to determining congressional intent. It provides that courts should not presume that Congress intended to su-persede state regulation of insurance unless the Act in question "specifi-cally relates to the business of insurance." See n. 5, *supra*. It therefore is necessary to consider the applicability of the McCarran-Ferguson Act in determining Congress' intent in Title VII. This presents two questions: whether the action at issue under Title VII involves the "business of insur-ance" and whether the application of Title VII would "invalidate, impair, or supersede" state law.

No one doubts that the determination of how risk should be spread among classes of insureds is an integral part of the "business of insurance." See *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205, 213 (1979); *SEC* v. *Variable Annuity Life Ins. Co.*, 359 U. S. 65, 73 (1959). The majority argues, nevertheless, that the McCarran-Ferguson Act is inapposite because Title VII will not supersede any state regulation. Because Title VII applies to employers rather than insurance carriers, the majority asserts that its view of Title VII will not affect the business of insurance. See *ante*, at 1087–1088, n. 17 (MARSHALL, J., concurring in judgment in part). This formalistic distinction ignores self-evident facts. State insurance laws, such as Arizona's, allow employers to purchase sex-based annuities for their employees. Title VII, as the majority interprets it, would prohibit employers from purchasing such annuities for their employees. It begs reality to say that a federal law that thus denies the right to do what state insurance law allows does not "invalidate, impair, or supersede" state law. Cf. *SEC* v. *Variable Annuity Life Ins. Co.*, *supra*, at 67. The majority's interpretation of Title VII—to the extent it banned the sale of actuarially sound, sex-based annuities—effectively would pre-empt state regulatory authority. In my view, the commands of the McCarran-Ferguson Act are directly relevant to determining Congress' intent in enacting Title VII.

sidered the widespread use of sex-based mortality tables to be discriminatory or that it intended to modify its previous grant by the McCarran-Ferguson Act of exclusive jurisdiction to the States to regulate the terms of protection offered by insurance companies. Rather, the legislative history indicates precisely the opposite.

The only reference to this issue occurs in an explanation of the Act by Senator Humphrey during the debates on the Senate floor. He stated that it was "unmistakably clear" that Title VII did not prohibit different treatment of men and women under industrial benefit plans.[7] See 110 Cong. Rec. 13663–13664 (1964). As we recognized in *Manhart*, "[alt]hough he did not address differences in employee contributions based on sex, Senator Humphrey apparently assumed that the 1964 Act would have little, if any, impact on existing pension plans." 435 U. S., at 714. This statement

---

[7] Senator Humphrey's statement was based on the adoption of the Bennett Amendment, which incorporated the affirmative defenses of the Equal Pay Act, 77 Stat. 56, 29 U. S. C. § 206(d), into Title VII. See *County of Washington* v. *Gunther*, 452 U. S. 161, 175, n. 15 (1981). Although not free from ambiguity, the legislative history of the Equal Pay Act provides ample support for Senator Humphrey's interpretation of that Act. In explaining the Equal Pay Act's affirmative defenses, the Senate Report on that statute noted that pension costs were "higher for women than men . . . because of the longer life span of women." S. Rep. No. 176, 88th Cong., 1st Sess., 4 (1963). It then explained that the question of additional costs associated with employing women was one "that can only be answered by an ad hoc investigation." *Ibid.* Thus, it concluded that where it could be shown that there were in fact higher costs for women than men, an exception to the Equal Pay Act could be permitted "similar to those . . . for a bona fide seniority system or other exception noted above." *Ibid.*

Even if other meanings might be drawn from the Equal Pay Act's legislative history, the crucial question is how Congress viewed the Equal Pay Act in 1964 when it incorporated it into Title VII. The only relevant legislative history that exists on this point demonstrates unmistakably that Congress perceived—with good reason—that "the 1964 Act [Title VII] would have little, if any, impact on existing pension plans." *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702, 714 (1978).

was not sufficient, as *Manhart* held, to preclude the application of Title VII to an *employer*-operated plan.   See *ibid.* But Senator Humphrey's explanation provides strong support for *Manhart*'s recognition that Congress intended Title VII to have *only* that indirect effect on the private insurance industry.

## B

As neither the language of the statute nor the legislative history supports its holding, the majority is compelled to rely on its perception of the policy expressed in Title VII.   The policy, of course, is broadly to proscribe discrimination in employment practices.   But the statute itself focuses specifically on the individual and "precludes treatment of individuals as simply components of a racial, religious, sexual, or national class."   *Id.*, at 708.   This specific focus has little relevance to the business of insurance.   See *id.*, at 724 (BLACKMUN, J., concurring in part and concurring in judgment). Insurance and life annuities exist because it is impossible to measure accurately how long any one individual will live. Insurance companies cannot make individual determinations of life expectancy; they must consider instead the life expectancy of identifiable groups.   Given a sufficiently large group of people, an insurance company can predict with considerable reliability the rate and frequency of deaths within the group based on the past mortality experience of similar groups.   Title VII's concern for the effect of employment practices on the individual thus is simply inapplicable to the actuarial predictions that must be made in writing insurance and annuities.

## C

The accuracy with which an insurance company predicts the rate of mortality depends on its ability to identify groups with similar mortality rates.   The writing of annuities thus requires that an insurance company group individuals according to attributes that have a significant correlation with mortality.   The most accurate classification system would be to

identify all attributes that have some verifiable correlation with mortality and divide people into groups accordingly, but the administrative cost of such an undertaking would be prohibitive. Instead of identifying all relevant attributes, most insurance companies classify individuals according to criteria that provide both an accurate and efficient measure of longevity, including a person's age and sex. These particular criteria are readily identifiable, stable, and easily verifiable. See Benston, The Economics of Gender Discrimination in Employee Fringe Benefits: *Manhart* Revisited, 49 U. Chi. L. Rev. 489, 499–501 (1982).

It is this practice—the use of a sex-based group classification—that the majority ultimately condemns. See *ante*, at 1083–1086 (MARSHALL, J., concurring in judgment in part). The policies underlying Title VII, rather than supporting the majority's decision, strongly suggest—at least for me—the opposite conclusion. This remedial statute was enacted to eradicate the types of discrimination in employment that then were pervasive in our society. The entire thrust of Title VII is directed against *discrimination*—disparate treatment on the basis of race or sex that intentionally or arbitrarily affects an individual. But as JUSTICE BLACKMUN has stated, life expectancy is a "nonstigmatizing factor that demonstrably differentiates females from males and that is not measurable on an individual basis. . . . [T]here is nothing arbitrary, irrational, or 'discriminatory' about recognizing the objective and accepted . . . disparity in female-male life expectancies in computing rates for retirement plans." *Manhart*, 435 U. S., at 724 (concurring in part and concurring in judgment). Explicit sexual classifications, to be sure, require close examination, but they are not automatically invalid.[8] Sex-based mortality tables reflect objective actuarial experience. Because their use does not entail discrimination in any

---

[8] Title VII does not preclude the use of all sex classifications, and there is no reason for assuming that Congress intended to do so in this instance. See n. 7, *supra.*

normal understanding of that term,[9] a court should hesitate to invalidate this long-approved practice on the basis of its own policy judgment.

Congress may choose to forbid the use of any sexual classifications in insurance, but nothing suggests that it intended to do so in Title VII. And certainly the policy underlying Title VII provides no warrant for extending the reach of the statute beyond Congress' intent.

## III

The District Court held that Arizona's voluntary pension plan violates Title VII and ordered that future annuity payments to female retirees be made equal to payments received by similarly situated men.[10] 486 F. Supp. 645 (Ariz. 1980). The Court of Appeals for the Ninth Circuit affirmed. 671 F. 2d 330 (1982). The Court today affirms the Court of Appeals' judgment insofar as it holds that Arizona's voluntary pension plan violates Title VII. But this finding of a statutory violation provides no basis for approving the retroactive relief awarded by the District Court. To approve this award would be both unprecedented and manifestly unjust.

We recognized in *Manhart* that retroactive relief is normally appropriate in the typical Title VII case, but concluded that the District Court had abused its discretion in awarding such relief. 435 U. S., at 719. As we noted, the employer in *Manhart* may well have assumed that its pension program was lawful. *Id.*, at 720. More importantly, a retroactive

---

[9] Indeed, if employers and insurance carriers offer annuities based on unisex mortality tables, men as a class will receive less aggregate benefits than similarly situated women.

[10] As JUSTICE MARSHALL notes, the relief awarded by the District Court is fundamentally retroactive in nature. See *ante*, at 1092 (concurring in judgment in part). Annuity payments are funded by the employee's past contributions and represent a return on those contributions. In order to provide women with the higher level of periodic payments ordered by the District Court, the State of Arizona would be required to fund retroactively the deficiency in past contributions made by its women retirees.

remedy would have had a potentially disruptive impact on the operation of the employer's pension plan. The business of underwriting insurance and life annuities requires careful approximation of risk. *Id.*, at 721. Reserves normally are sufficient to cover only the cost of funding and administering the plan. Should an unforeseen contingency occur, such as a drastic change in the legal rules governing pension and insurance funds, both the insurer's solvency and the insured's benefits could be jeopardized. *Ibid.*

This case presents no different considerations. *Manhart* did put all employer-operated pension funds on notice that they could not "requir[e] that men and women make unequal contributions to [the] fund," *id.*, at 717, but it expressly confirmed that an employer could set aside equal contributions and let each retiree purchase whatever benefit his or her contributions could command on the "open market," *id.*, at 718. Given this explicit limitation, an employer reasonably could have assumed that it would be lawful to make available to its employees annuities offered by insurance companies on the open market.

As in *Manhart*, holding employers liable retroactively would have devastating results. The holding applies to all employer-sponsored pension plans, and the cost of complying with the District Court's award of retroactive relief would range from $817 to $1,260 million annually for the next 15 to 30 years.[11] Department of Labor Cost Study 32. In this case, the cost would fall on the State of Arizona. Presumably other state and local governments also would be affected directly by today's decision. Imposing such unanticipated

---

[11] The cost to employers of equalizing benefits varies according to three factors: (i) whether the plan is a defined-contribution or a defined-benefit plan; (ii) whether benefits are to be equalized retroactively or prospectively; and (iii) whether the insurer may reallocate resources between men and women by applying unisex rates to existing reserves or must top up women's benefits. The figures in text assume, as the District Court appeared to hold, see 486 F. Supp. 645, 652 (Ariz. 1980), that employers would be required to top up women's benefits.

financial burdens would come at a time when many States and local governments are struggling to meet substantial fiscal deficits. Income, excise, and property taxes are being increased. There is no justification for this Court, particularly in view of the question left open in *Manhart*, to impose this magnitude of burden retroactively on the public. Accordingly, liability should be prospective only.[12]

JUSTICE O'CONNOR, concurring.

This case requires us to determine whether Title VII prohibits an employer from offering an annuity plan in which the participating insurance company uses sex-based tables for calculating monthly benefit payments. It is important to stress that our judicial role is simply to discern the intent of the 88th Congress in enacting Title VII of the Civil Rights Act of 1964,[1] a statute covering only discrimination in employment. What we, if sitting as legislators, might consider wise legislative policy is irrelevant to our task. Nor, as JUSTICE MARSHALL notes, *ante*, at 1078–1079, n. 4, do we have before us any constitutional challenge. Finally, our decision must ignore (and our holding has no necessary effect on) the larger issue of whether considerations of sex should be barred from all insurance plans, including individual purchases of insurance, an issue that Congress is currently debating. See S. 372, 98th Cong., 1st Sess. (1983); H. R. 100, 98th Cong., 1st Sess. (1983).

Although the issue presented for our decision is a narrow one, the answer is far from self-evident. As with many

---

[12] In this respect, I agree with JUSTICE O'CONNOR that only benefits derived from contributions collected after the effective date of the judgment need be calculated without regard to the sex of the employee. See *post*, at 1111 (O'CONNOR, J., concurring).

[1] The 92d Congress made important amendments to Title VII, including extending its coverage to state employers such as the State of Arizona. The 1972 amendments did not change the substantive requirements of Title VII, however. Thus, it is the intent of the 88th Congress that is controlling here.

other narrow issues of statutory construction, the general language chosen by Congress does not clearly resolve the precise question. Our polestar, however, must be the intent of Congress, and the guiding lights are the language, structure, and legislative history of Title VII. Our inquiry is made somewhat easier by the fact that this Court, in *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702 (1978), analyzed the intent of the 88th Congress on a related question. The Court in *Manhart* found Title VII's focus on the individual to be dispositive of the present question. Congress in enacting Title VII intended to prohibit an employer from singling out an employee by race or sex for the purpose of imposing a greater burden or denying an equal benefit because of a characteristic statistically identifiable with the group but empirically false in many individual cases. See *Manhart*, 435 U. S., at 708–710.

Despite JUSTICE POWELL's argument, ultimately I am persuaded that the result in *Manhart* is not distinguishable from the present situation. *Manhart* did note that Title VII would allow an employer to set aside equal retirement contributions for each employee and let the retiree purchase whatever annuity his or her accumulated contributions could command on the open market. *Id.*, at 717–718. In that situation, the employer is treating each employee without regard to sex. If an independent insurance company then classifies persons on the basis of sex, the disadvantaged female worker cannot claim she was denied a privilege of employment, any more than she could complain of employment discrimination when the employer pays equal wages in a community where local merchants charge women more than men for identical items. As I stressed above, Title VII covers only discrimination in *employment*, and thus simply does not reach these other situations.

Unlike these examples, however, the employer here has done more than set aside equal lump sums for all employees. Title VII clearly does not allow an employer to offer a plan

to employees under which it will collect equal contributions, hold them in a trust account, and upon retirement disburse greater monthly checks to men than women. Nor could an employer escape Title VII's mandate by using a third-party bank to hold and manage the account. In the situation at issue here, the employer has used third-party insurance companies to administer the plan, but the plan remains essentially a "privileg[e] of employment," and thus is covered by Title VII. 42 U. S. C. § 2000e–2(a)(1).[2]

For these reasons, I join Parts I, II, and III of JUSTICE MARSHALL's opinion. Unlike JUSTICE MARSHALL, however, I would not make our holding retroactive. Rather, for reasons explained below, I agree with JUSTICE POWELL that our decision should be prospective. I therefore join Part III of JUSTICE POWELL's opinion.

In *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 105–109 (1971), we set forth three criteria for determining when to apply a decision of statutory interpretation prospectively. First, the decision must establish a new principle of law, either by overruling clear past precedent or by deciding an issue of first impression whose resolution was not clearly foreshadowed. *Id.*, at 106. Ultimately, I find this case controlled by the same principles of Title VII articulated by the Court in *Manhart*. If this first criterion were the sole consideration for prospectivity, I might find it difficult to make today's decision prospective. As reflected in JUSTICE POWELL's opinion, however, whether *Manhart* foreshadows today's decision is sufficiently debatable that the first criterion of the *Chevron* test does not compel retroactivity here. Therefore, we must examine the remaining criteria of the *Chevron* test as well.

---

[2] The distinction between employment-related discrimination and discrimination not covered by Title VII is ably discussed by Van Alstyne, Equality for Individuals or Equality for Groups: Implications of the Supreme Court Decision in the Manhart Case, 64 AAUP Bulletin 150 (1978).

The second criterion is whether retroactivity will further or retard the operation of the statute. *Chevron, supra,* at 106–107. See also *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 421 (1975) (backpay should be denied only for reasons that will not frustrate the central statutory purposes). *Manhart* held that a central purpose of Title VII is to prevent employers from treating individual workers on the basis of sexual or racial group characteristics. Although retroactive application will not retard the achievement of this purpose, that goal in no way requires retroactivity. I see no reason to believe that a retroactive holding is necessary to ensure that pension plan administrators, who may have thought until our decision today that Title VII did not extend to plans involving third-party insurers, will not now quickly conform their plans to ensure that individual employees are allowed equal monthly benefits regardless of sex. See *Manhart, supra,* at 720–721.[3]

In my view, the third criterion—whether retroactive application would impose inequitable results—compels a prospective decision in these circumstances. Many working men and women have based their retirement decisions on expectations of a certain stream of income during retirement. These decisions depend on the existence of adequate reserves to fund these pensions. A retroactive holding by this Court that employers must disburse greater annuity benefits than the collected contributions can support would jeopardize the entire pension fund. If a fund cannot meet its obligations, "[t]he harm would fall in large part on innocent third parties." *Manhart, supra,* at 722–723. This real danger of bankrupting pension funds requires that our decision be made prospective. Such a prospective holding is, of course,

---

[3] Another goal of Title VII is to make persons whole for injuries suffered from unlawful employment discrimination. See *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975). Although this goal would suggest that the present decision should be made retroactive, it does not necessarily control the decision on retroactivity. See *Manhart,* 435 U. S., at 719.

consistent with our equitable powers under Title VII to fashion an appropriate remedy. See 42 U. S. C. § 2000e–5(g); *Manhart*, 435 U. S., at 718–719.

In my view, then, our holding should be made prospective in the following sense. I would require employers to ensure that benefits derived from contributions collected after the effective date of our judgment be calculated without regard to the sex of the employee.[4] For contributions collected before the effective date of our judgment, however, I would allow employers and participating insurers to calculate the resulting benefits as they have in the past.

---

[4] In other words, I would require employers to use longevity tables that reflect the average longevity of all their workers. The Equal Pay Act proviso, 29 U. S. C. § 206(d)(1), which forbids employers to cure violations of the Act by reducing the wage rate of any employee, would not require that employers "top up" benefits by using male-longevity tables for all workers. First, although the Bennett Amendment of Title VII, 42 U. S. C. § 2000e–2(h), incorporates the Equal Pay Act defenses for disparate "compensation" as well as disparate "wages," see *Manhart, supra,* at 711–712, n. 22, the language of the Equal Pay Act proviso seems to apply only to wages. Thus, it is questionable whether the proviso would apply at all to the retirement plan at issue here. Second, even if the proviso has some relevance here, it should not be read to require a pension plan, whose entire function is actuarially to balance contributions with outgoing benefits, to calculate benefits on the basis of tables that do not reflect the composition of the work force. Cf. *Manhart, supra,* at 720, n. 36 (remedy should at least consider "ordering a refund of only the difference between contributions made by women and the contributions they would have made under an actuarially sound and nondiscriminatory plan").