724 F.2d 1390
 33 Fair Empl.Prac.Cas. 1708,
33 Empl. Prac. Dec. P 34,140,
5 Employee Benefits Ca 1122
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
v.
BORDEN'S, INC., a corporation, Defendant-Appellant,
International Brotherhood of Teamsters, Chauffeurs and
Warehousemen, Local 274, and International Union
of Operative Engineers, Local 428, Defendants.
 CA No. 83-1701.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 16, 1983.
Decided Jan. 31, 1984.
 
 Dianna B. Johnston, Barbara Neilson, McGuiness & Williams, Washington, D.C., for plaintiff-appellee.
 William R. Neale, Columbus, Ohio, for defendant-appellant.
 Appeal from the United States District Court for the District of Arizona.
 Before GOODWIN, SCHROEDER and FARRIS, Circuit Judges.
 FARRIS, Circuit Judge:
 
 INTRODUCTION
 
 1
 Borden closed its dairy plant in Phoenix, Arizona on December 31, 1979, and fired the employees, except for a few managers. Discharged employees received severance pay according to a policy executed in November, 1979, as an addendum to the collective bargaining agreements reached that year. Under the terms of the policy, employees eligible for retirement were not entitled to severance pay. Eligibility for retirement came at age 55 and after 10 years service with Borden.[1]
 
 
 2
 Sixteen of the 48 employees at the Phoenix plant were age 55 or over. None of these sixteen received severance pay. Fifteen were disqualified because they were eligible for retirement, and the other because he had only worked at the plant for several months. Three other employees besides those age 55 were denied severance pay, for reasons not apparent from the record.
 
 
 3
 On January 7, 1981, the Equal Employment Opportunity Commission filed suit against Borden and the two labor unions that represented workers at the Phoenix plant. (The unions signed a consent decree with the EEOC and were dropped from the suit.) The Commission alleged that the denial of severance pay to employees eligible for retirement violated the Age Discrimination in Employment Act, 29 U.S.C. Sec. 621 et seq. On cross motions for summary judgment the United States District Court of Arizona, per Judge Cordova, held for the EEOC. The court found that the severance pay policy had a discriminatory impact on older workers and was not a "bona fide employee benefit plan" exempted from the Act's strictures by 29 U.S.C. Sec. 623(f)(2). 551 F.Supp. 1095 (D.Ariz.1982). Borden has appealed. The Equal Employment Advisory Council, an association of employers, has filed an amicus brief supporting Borden. We affirm.
 
 ISSUES
 
 4
 This appeal presents two questions: 1) whether Borden's policy of denying severance pay to employees eligible for retirement discriminates on the basis of age; 2) whether Borden's severance pay policy qualifies for the "bona fide employee benefit plan" exception under the Age Discrimination in Employment Act, 29 U.S.C. Sec. 623(f)(2).
 
 ANALYSIS
 A. Standard of Review
 
 5
 The facts are not in dispute, though the parties characterize them differently. Neither party asserts that summary judgment was inappropriate. The district court interpreted the statute and applied it to stipulated facts. The standard of review is de novo. Turner v. Prod, 707 F.2d 1109, 1114 (9th Cir.1983). See also M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483, 1487 (9th Cir.1983): "In reviewing a grant of summary judgment, our task is identical to that of the trial court."
 
 B. Age discrimination
 1. Introduction
 
 6
 The Age Discrimination in Employment Act forbids an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. Sec. 623(a)(1). Plaintiffs alleging age discrimination can proceed under "disparate treatment" or "disparate impact" theories. Douglas v. Anderson, 656 F.2d 528, 531 & n. 1 (9th Cir.1981). The chief difference between them is that disparate treatment involves discriminatory intent, whereas intent need not be shown in a disparate impact case. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Many disparate treatment cases, including McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), concern a decision to hire, fire, or promote a particular job applicant or employee. Since these disputes usually focus on the employer's true motive, proof of discriminatory intent is crucial. By contrast, disparate impact cases typically involve an employment test or criterion or other general policy. Beginning with Griggs v. Duke Power Co., 401 U.S. 424, 431-2, 91 S.Ct. 849, 853-4, 28 L.Ed.2d 158 (1971), the Supreme Court has struck down employment policies that unduly harm the members of a protected group, regardless of the employer's intent. See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).
 
 
 7
 The EEOC raised both sorts of claims. The district court rejected the disparate treatment argument, stated that "[p]laintiff's arguments are more properly considered under a disparate impact theory," 551 F.Supp. at 1098, and found that Borden had discriminated against its older workers. Id. at 1099. While we do not disagree with the district court's disparate impact analysis, we also hold that the EEOC is entitled to prevail under the disparate treatment theory.
 
 2. Disparate treatment
 
 8
 Borden's severance pay policy denied a benefit to certain employees because they were age 55 or older. The discrimination was intentional in the sense that Borden purposefully drafted its severance pay policy to have this effect. We need look no further for the intent necessary to support a finding of discrimination under the disparate treatment theory. In so holding we adhere to our approach in Norris v. Arizona Governing Committee, 671 F.2d 330 (9th Cir.1982), aff'd. in relevant part, --- U.S. ----, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983), a case that, like the present one, concerns employee benefits. There we stated that "facially discriminatory practices are intentional discrimination for the purposes of Title VII regardless of the subjective motivation [citations omitted]. Thus, because on their face the practices in question treat men and women differently, Norris need not prove Arizona's animus in adopting the plan." Id. at 334. Similarly, we do not require a showing of Borden's animus or ill will toward older people. See Gerdom v. Continental Airlines, Inc., 692 F.2d 602, 608 (9th Cir.1982) (en banc), cert. dismissed, --- U.S. ----, 103 S.Ct. 1534, 75 L.Ed.2d 954 (1983).
 
 
 9
 Borden and the amicus argue that the severance policy distinguished employees on the basis of their retirement status, and not solely because of age. But this fact does not suffice to defeat a claim of disparate treatment under the ADEA. We have twice held that an employer discriminates "because of" age whenever age is a "but for" cause of discrimination. Cancellier v. Federated Department Stores, 672 F.2d 1312, 1315-6 (9th Cir.), cert. denied, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982); Kelly v. American Standard, Inc., 640 F.2d 974, 984 (9th Cir.1981).[2] Age was a "but for" cause or necessary condition for the denial of severance pay to Borden's retireable employees, since only employees 55 or older were eligible for retirement. Borden's distinction between age and retireability is especially hollow here, where 15 out of the 16 employees 55 or older had served the 10 years necessary to qualify them for retirement.
 
 
 10
 Borden and the amicus attempt to justify the severance policy by pointing out that each retiree will receive benefits in the form of insurance coverage and pension income that could be worth considerably more than the severance pay he would have received. Therefore, they argue, the severance plan has no adverse effect on retireable employees and does not discriminate against them. The district court rejected this argument:
 
 
 11
 While there is little doubt that the retirement benefits are of greater value than the severance pay, Borden's attempts to characterize the situation as a choice between severance pay and retirement benefits is not supported by the evidence .... The eleven fifty-five year old employees named in this suit were adversely affected because they were forced to give up a newly created benefit given to other employees (severance pay) in exchange for benefits they already had (retirement).
 
 
 12
 551 F.Supp. at 1098. We agree with the district court's clear and persuasive response. We write further to clarify the legal standard that leads us to reject the justification Borden offers for its policy. Many cases applying the disparate treatment theory, citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S.Ct. at 1824, require the employer to give a "legitimate, nondiscriminatory reason" for his or her behavior. See, e.g., Limongelli v. Postmaster General, 707 F.2d 368, 372 (9th Cir.1983); Sutton v. Atlantic Richfield Co., 646 F.2d 407, 411-12 (9th Cir.1981). Though we proceed under the theory of disparate treatment, we need not follow the literal language of McDonnell Douglas. "The method suggested in McDonnell Douglas ... was never intended to be rigid, mechanized, or ritualistic." Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The proper standard for evaluating an employer's proposed justification depends on the facts and not only on whether the case is classified as one of disparate treatment or disparate impact. In McDonnell Douglas the Court was trying to isolate the predominant motive in a personnel decision involving several factors. Here we are not concerned with ferreting out the employer's true motive. Another reason for rejecting the "legitimate, nondiscriminatory reason" standard is that the phrase, strictly speaking, pertains to whether the employer has sufficiently rebutted the plaintiff's prima facie case to avoid a legal presumption of discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Here we are not dealing with whether Borden cleared that preliminary hurdle; we are deciding the ultimate issue of whether its policy was discriminatory.
 
 
 13
 The district court measured Borden's argument against the "business necessity" standard of Griggs v. Duke Power Co. This standard also misses the mark, since Borden is not arguing that its policy was economically necessary but rather that it treated older workers fairly. The applicable standard is supplied by the ADEA itself, which provides a general defense "where the differentiation is based on reasonable factors other than age." 29 U.S.C. Sec. 623(f)(1). We hold that even though retireable employees were eligible for pension and insurance benefits, this fact is not a "reasonable factor other than age" justifying the denial of severance pay.
 
 3. Disparate impact
 
 14
 We determine whether a policy has a disparate impact by looking at its effect on the protected class. Borden's policy denied severance pay to all 16 of its employees age 55 or over. Borden does not challenge this factual finding but argues that disparate impact theory is not applicable in (1) suits under the ADEA and (2) suits concerning employee compensation. While it is true that the disparate impact theory first arose in cases under Title VII of the Civil Rights Act of 1964, the similar language, structure, and purpose of Title VII and the ADEA, as well as the similarity of the analytic problems posed in interpreting the two statutes, has led us to adopt disparate impact in cases under the ADEA. Douglas v. Anderson, 656 F.2d at 531 n. 1; Kelly v. American Standard, Inc., 640 F.2d at 980 & n. 9 (9th Cir.1981). See, concerning the similarity of Title VII and the ADEA, Kauffman v. Sidereal Corp., 695 F.2d 343, 346 n. 1 (9th Cir.1982); Sutton v. Atlantic Richfield Co., 646 F.2d at 411. It is also true that disparate impact is most commonly applied in cases involving the illegal classification of employees under Sec. 703(a)(2) of Title VII, 42 U.S.C. Sec. 2000e-2(a)(2), which corresponds to Sec. 4(a)(2) of the ADEA, 29 U.S.C. Sec. 623(a)(2). The present case concerns discrimination in compensation, proscribed by Sec. 4(a)(1) of the ADEA, 29 U.S.C. Sec. 623(a)(1). But we have held that disparate impact theory can be used in suits under Sec. 703(a)(1) of Title VII, the analog of 29 U.S.C. Sec. 623(a)(1). Wambheim v. J.C. Penney Co., Inc., 705 F.2d 1492, 1494 (9th Cir.1983). See also Hung Ping Wang v. Hoffman, 694 F.2d 1146 (9th Cir.1982), which applied disparate impact analysis in what appears to be an "(a)(1)" case. We see no reason to confine the disparate impact theory in the manner suggested by Borden.
 
 
 15
 Under the disparate impact approach we would next consider the justification offered by Borden in defense of its policy. We have already considered and rejected Borden's justification as not "based on reasonable factors other than age."
 
 
 16
 C. Bona fide employee benefit plan exception
 
 
 17
 The ADEA provides an affirmative defense that permits an employer
 
 
 18
 to observe the terms of ... any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual [or involuntary retirement on account of age].
 
 
 19
 29 U.S.C. Sec. 623(f)(2). To qualify for exemption under Sec. 623(f)(2), Borden's severance pay policy must meet four criteria: 1) It must be the sort of "plan" covered by the section. 2) It must be "bona fide", which has been held to mean no more than that the plan exists and pays substantial benefits. Marshall v. Hawaiian Telephone Co., 575 F.2d 763, 766 (9th Cir.1978). 3) Borden's act must be in observance of its plan. No one disputes that Borden followed its own policy in this case. 4) The plan must not be a subterfuge to evade the purposes of the act.[3] The district court ruled against Borden on the first ground, finding that the severance pay policy was not a "plan" within the meaning of Sec. 623(f)(2). We agree.
 
 
 20
 Congress qualified the words "bona fide employee benefit plan" with the phrase "such as a retirement, pension, or insurance plan." While this phrase may not exhaust the coverage of Sec. 623(f)(2), we should not disregard it. It suggests that Congress meant to exempt only certain benefit schemes from the antidiscriminatory provisions of the Act. The legislative history aids in our construction by revealing these purposes behind the benefit plan exception[4]:
 
 
 21
 a) Avoiding the pension plan issue
 
 
 22
 The ADEA was passed seven years before ERISA, Congress' major effort at pension reform. Senator Javitz, one of the ADEA's sponsors, stated during the Senate hearings that the Act "should not be used as the place to fight the pension battle." Hearings on S. 830 before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 90th Cong., 1st Sess. 27 (1967). Senator Yarborough, the bill's other sponsor, posed the hypothetical problem of an elderly worker who would be forced to retire before he could acquire vested rights under the company's pension plan. The Senator explained that Sec. 623(f)(2) would preserve the pension plan undisturbed, so that employers could hire older workers without incurring unanticipated obligations. 113 Cong.Rec. 31255 (1967).
 
 
 23
 b) Equal costs for older employees
 
 
 24
 The cost of benefits such as life insurance, medical insurance, and pensions is greater for newly hired older workers than for other employees. Recognition of this fact spurred Senator Javitz to propose an amendment that created the "bona fide benefit plan" exception of Sec. 623(f)(2). He stated:
 
 
 25
 The administration bill, which permits involuntary separation under bona fide retirement plans, meets only part of the problem. It does not provide any flexibility in the amount of pension benefits payable to older workers depending on their age when hired, and thus may actually encourage employers, faced with the necessity of paying greatly increased premiums, to look for excuses not to hire older workers when they might have hired them under a law granting them a degree of flexibility with respect to such matters.
 
 
 26
 Senate Hearings at 27. The present regulatory interpretation of Sec. 623(f)(2), which dates from March 25, 1979, follows this rationale to define the scope of the benefit plan exception:
 
 
 27
 The legislative history of this provision indicates that its purpose is to permit age-based reductions in employee benefit plans where such reductions are justified by significant cost considerations .... A benefit plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits or insurance coverage.
 
 
 28
 29 C.F.R. Sec. 860.120(a)(1) (1982). Nor is this regulation an innovation. The Department of Labor, which administered the Act before the EEOC, used similar language in an interpretation issued soon after the Act was passed. See 34 Fed.Reg. 9709 (June 21, 1969).
 
 
 29
 Given the language and purposes of the statute and the regulations to which we owe deference, we find that Borden's severance pay policy is not an "employee benefit plan, such as a retirement, pension, or insurance plan." Congress sought to avoid disrupting pensions and other complex, on-going benefit schemes. Borden's policy, by contrast, is a one-time, ad hoc cash payment. Congress also meant to encourage the hiring of older workers by relieving employers of the duty to provide them with equal benefits--where equal benefits would be more costly for older workers. But severance pay costs no more for a newly hired older worker than for his or her younger counterpart.
 
 
 30
 Alford v. City of Lubbock, 664 F.2d 1263 (5th Cir.), cert. denied, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 848 (1982), supports our conclusion. There the court upheld Lubbock's policy of denying pension benefits to employees hired after age 50, but forbade Lubbock to withhold payment for accrued unused sick leave to such employees. The court held that the sick pay was not part of an "employee benefit plan, such as a retirement, pension, or insurance plan." It stated that Sec. 623(f)(2) did not protect the "discriminatory administration of a simple fringe benefit." Id. at 1271-2.
 
 
 31
 Borden argues that the severance pay policy was an integral part of its retirement and pension package. The facts indicate otherwise. The severance policy was proposed to the Teamsters and the Operating Engineers in separate letters dated July 26, 1979 and June 27, 1979, respectively. The Teamsters executed the severance pay agreement on November 5, 1979, more than three months after the collective bargaining agreement. The Operating Engineers accepted the severance pay agreement and the collective bargaining agreement on the same day, November 9, 1979. There is no evidence that the severance pay proposal caused the collective bargaining agreements to be renegotiated or affected them in any other way. The collective bargaining agreements were, in turn, only loosely integrated with the pension, retirement, and insurance plans, which were embodied in separate documents. We recognize that a severance pay policy which is an integral part of a complex benefit scheme might be regarded differently, although even then the denial of severance pay to retireable employees can pose difficulties. EEOC v. Westinghouse Electric Corp., 725 F.2d 211 at 224-25, (3d Cir. 1983) (provision of long-standing Layoff Income and Benefit plan denying severance pay to retireable employees held not part of a "bona fide employee benefit plan"). Here the evidence shows that Borden's severance pay policy was a "simple fringe benefit," outside the scope of Sec. 623(f)(2).
 
 CONCLUSION
 
 32
 Borden's severance pay policy discriminates against workers over 55, under either the disparate impact or disparate treatment theory. The fact that age alone did not bar collection of severance pay does not defeat the EEOC's claim. Borden's justification for denying severance pay to workers eligible for retirement is unpersuasive.
 
 
 33
 Borden's construction of Sec. 623(f)(2) would permit unlimited discrimination in the field of benefits, contrary to the limited purposes of the sponsors of the benefit plan exception and the regulations propounded by the enforcing agency. The district court correctly rejected Borden's attempt to portray its severance pay policy as part of a coordinated benefit plan.
 
 
 34
 Affirmed.
 
 
 
 [1]
 In addition to disqualifying retireable employees, Borden's policy denied severance pay to employees who did not work until the plant closing date, or who transferred to another job with Borden when the plant closed, or who had not worked for Borden for one continuous year
 
 
 [2]
 See also Los Angeles Department of Water and Power v. Manhart, 435 U.S. 702, 711, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978), where the Court wrote that the "simple test [of sex discrimination is] whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different' " (emphasis supplied)
 
 
 [3]
 It is customary to divide the statute into three pieces, as the district court did at 551 F.Supp. 1099. See also EEOC v. Home Insurance Co., 672 F.2d 252 (2d Cir.1982). We have parsed it into four pieces by separating the question of bona fides from the question of whether the policy is a "plan" covered by Sec. 623(f)(2)
 
 
 [4]
 One purpose, not relevant in the present case, was the protection of pre-existing benefit plans. In United Air Lines, Inc. v. McMann, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), the sole Supreme Court case interpreting Sec. 623(f)(2), the Court relied heavily on the fact that United's retirement plan predated the ADEA and upheld United's involuntary retirement of McMann at age 60. (The result in McMann has since been overruled by Congressional amendment.) The majority cited Labor Secretary Wirtz's Senate testimony for the proposition that Sec. 623(f)(2) was meant to protect existing retirement plans. Id. at 199, 98 S.Ct. at 448. While the Court did not hold that the benefit plan exception was merely a "grandfather" clause--in fact, there is legislative history to the contrary, id. at 203 n. 9, 98 S.Ct. at 450 n. 9,--the Court inferred that an important purpose of Sec. 623(f)(2) was to protect existing plans