Adele **GRAHAM** and Tamaara Danish, individually and as representatives of a class of persons similarly situated, Plaintiffs,

v.

**STATE OF NEW YORK, DEPARTMENT OF CIVIL SERVICE; Edward V. Regan, as Comptroller of the State of New York; Mario Cuomo, as Governor of the State of New York, Defendants.**

No. 84 Civ. 4546 (WCC).

United States District Court,
S.D. New York.

Feb. 17, 1987.

James I. Meyerson, New York City, Graham & Graham, Denver, Colo., for plaintiffs; Adele Graham, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Judith T. Kramer, Jan P. Ryan, Asst. Attys. Gen., of counsel.

WILLIAM C. CONNER, District Judge:

Upon retirement, an employee of the State of New York ("the State") receives from the State a monthly credit toward the cost of his health care insurance based on the amount of accumulated-but-unused sick leave he had at the time he retired. The amount of this monthly credit is fixed at the time of the employee's retirement, and is paid to him for the remainder of his lifetime. In calculating the amount of the credit, the State uses actuarial tables to determine the retiree's remaining life expectancy. It currently uses unisex actuarial tables to make this calculation, but prior to August 1, 1983, it used sex-based actuarial tables to do so.

Plaintiff Adele Graham ("Graham") retired from her position as a staff attorney in the State's Division of Human Rights in 1981. She brought this action against the State and certain state officials alleging that the use of sex-based actuarial tables prior to August 1, 1983 violated title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §§ 2000e to 2000e–17 (1982), the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1982), the fourteenth amendment to the United States Constitution, and article I, § 11 of the New York Constitution. She proposes to represent a class of female employees who retired prior to August 1, 1983, and seeks on their behalf a retroactive award of the difference between the credits they have received and the credits their male counterparts have received.[1]

I suggested to the parties that before they litigate the issue of whether a plaintiff class should be certified, they address the potentially dispositive issue of whether the proposed class is entitled to the retroactive relief Graham seeks on its behalf. Because the parties agreed that this issue is essentially one of law, I further suggested that they stipulate to a statement of agreed facts and cross-move for summary judgment. The parties endorsed this suggestion in a status conference before me on December 19, 1986 and, by letters dated December 22, 1986 and December 23, 1986, further agreed to: (1) stipulate to the remaining issues of identification and certification of an agreed class; (2) stipulate to the dismissal of any unnecessary defendants; and (3) submit the amended affidavit of Thomas McCracken from which the parties can calculate the retroactive benefits due. Defendants have indicated that by proceeding in this manner, they do so without prejudice to their right to pursue other defenses raised in their answer. (*See* Defendant's letter dated December 23, 1986.) It appearing that no question of fact remains to be resolved at trial, the parties' submissions to date should be treated as a motion for summary judgment.

For the reasons stated below, I conclude that plaintiff and the class she proposes to represent are entitled to the retroactive relief she seeks, at least in part as described below. Accordingly, plaintiff's mo-

---

1. Tamaara Danish also sued as a class representative. However, she has not yet retired from civil service and the State has stopped using sex-based actuarial tables to calculate the credit at issue here. Accordingly, the parties agree that Danish has not been affected by the State's previous practice and she has apparently abandoned her claim. *See* Plaintiffs' Memorandum of Law in Support of the Doctrine of Retroactivity at 7.

tion for summary judgment is granted and defendants' cross motion for summary judgment is denied.

*Background*

New York Civil Service Law § 163 provides that a retired employee of the State of New York is eligible to participate in a health insurance plan established for state employees. Pursuant to Civil Service Law § 167, the State makes contributions toward the cost of this health insurance, and the retired employee pays the balance through deductions from his retirement allowance.

Section 167(4) provides that, in specified circumstances, a retired employee's contribution toward the cost of the health insurance may be reduced or eliminated as a result of sick leave accrued but not used at the time of the employee's retirement. Section 167(4) provides in relevant part:

> the department of civil service shall determine, based on the employee's age at the time of retirement, the actuarial equivalent in monthly installments for the remaining life expectancy of such retired employee, of the dollar value of the earned and accumulated but unused sick leave standing to his credit at the time of retirement, without interest. Such dollar value shall be based on the employee's salary at the time of retirement. In addition to regular employer contributions, contributions in the amount of such monthly installments shall be paid from the state's appropriation to the health insurance fund and applied towards the charges for health insurance on account of such retired employee and his dependents, to the extent necessary to pay such charges. The remaining amount, if any, necessary to pay such charges shall be contributed by such retired employee.

N.Y.Civ.Serv.Law § 167(4) (McKinney 1983).

In accordance with this provision, the Employee Insurance Section of the State Department of Civil Service makes the following calculations when an employee retires with unused sick leave. First, the Department calculates the dollar value of the employee's unused sick leave by multiplying the number of days of unused leave by the employee's daily rate of pay at the time of retirement. If this dollar value is greater than $100, the Department calculates an actuarial equivalent in monthly installments by dividing the dollar value of the unused sick leave by the number of months in the employee's remaining life expectancy, as indicated in the Department's actuarial tables.[2] The State then contributes this monthly installment toward the employee's insurance plan premiums in addition to the State's ordinary contribution. Thus, in effect, the employee receives a credit against his health insurance costs for his unused sick leave.

Prior to August 1, 1983, the Department calculated the monthly installment by using sex-based actuarial tables. These tables showed longer life expectancies for women than for men, and therefore produced lower monthly credits for women. However, on August 1, 1983, the Department began to use unisex actuarial tables to calculate the monthly credit in order to comply with the Supreme Court's decision in *Arizona Governing Committee for Tax Deferred Annuity & Deferred Compensation Plans v. Norris*, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983) (per curiam). In *Norris*, the Court held that title VII prohibits an employer from offering a retirement plan that awards a woman lower monthly benefits than a man who has made the same contributions, even though sex-based actuarial tables indicate that, as a group, women live longer than men. In effect, the Court barred the use of sex-based actuarial tables in calculating employee retirement benefits.

The Court held that it would impose only prospective liability for the violation in *Norris*, and directed the Clerk of the Court to issue judgment on August 1, 1983, some

---

2. Where the dollar value of an employee's unused sick leave is less than $100, the State does not calculate an actuarial equivalent.

**1366**

three weeks after the date of the Court's opinion. *Id.* at 1075. The State of New York concluded that *Norris* required it to terminate its use of sex-based actuarial tables in calculating the monthly credits for unused sick leave. However, the State apparently also decided that the Court's decision to impose only prospective liability did not require it to adjust retroactively the monthly credits of women who retired prior to the effective date of the Court's decision. Accordingly, the State did not and has not done so.

Even though the Supreme Court held that it was inappropriate to impose retroactive liability in *Norris,* Graham contends that it should be imposed here because the State knew or should have known that its use of sex-based actuarial tables violated title VII long before *Norris* was decided. In particular, she argues that the Supreme Court's decision in *City of Los Angeles Department of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), put the State on notice in 1978 that its practice of using sex-based tables was improper.[3] Graham suggests that the most appropriate means of remedying the State's alleged violation of title VII is to adjust retroactively the monthly credits of women who retired between the date *Manhart* was decided and the date *Norris* became effective to match the credits received by similarly situated men who retired during the same period. For the following reasons, I agree with Graham that *Manhart* put the State on notice that its use of sex-based actuarial tables was illegal and is entitled to the retroactive relief she seeks, with one qualification discussed below.

*Discussion*

**1. The Legal Context**

In order to put the issues of this case in context, it is necessary to examine the Su-

preme Court's decision in *Manhart* and *Norris* in greater detail. In *Manhart,* the Supreme Court considered the validity of a pension plan operated by the Los Angeles Department of Water and Power for its employees. The plan was funded entirely by contributions from the Department and its employees; no insurance company was involved in administering the plan or paying benefits. 435 U.S. at 705, 98 S.Ct. at 1373. Upon retirement, each employee received a lifetime monthly benefit computed as a fraction of his salary multiplied by his years of service. Similarly situated men and women received equal monthly benefits, but because actuarial tables showed that women generally live longer than men, the Department required that women make larger contributions to the plan than comparable male employees.

The Supreme Court held that the Department's plan violated title VII. It ruled that an employer cannot require a woman to pay larger contributions to an employer-run retirement plan in order to receive the same benefits given to a man of the same age, seniority, and salary. The Court acknowledged that "as a class women live longer than men," but emphasized that title VII focuses "unambiguously" on the individual, and precludes employers from treating "individuals as simply components of a racial, religious, sexual or national class." *Id.* at 708, 98 S.Ct. at 1375.

The Court concluded that by using sex-based actuarial tables, the Los Angeles Department unlawfully treated its female employees as components of a sexual class rather than as individuals; the Court stated that the Department had attributed a characteristic true of women as a group—that they live longer than men—to all women in its employ, regardless of whether they

**3.** Alternatively, Graham argues that Judge Ward's decision in *Spirt v. Teachers Ins. & Annuity Ass'n,* 475 F.Supp. 1298 (S.D.N.Y.1979), *aff'd in part, rev'd in part, and remanded,* 691 F.2d 1054 (2d Cir.1982), *vacated and remanded,* 463 U.S. 1223, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983), *decision on remand,* 735 F.2d 23 (2d Cir.1984), *cert. denied,* 469 U.S. 881, 105 S.Ct.

247, 83 L.Ed.2d 185 (1984), or our court of appeals' first decision in *Spirt* put the State on notice in 1979 or 1982 that its practice was improper. Because I conclude below that *Manhart* made clear that the State's policy was illegal, I need not and do not address whether these subsequent lower court decisions also served to put the State on notice.

would come to share that characteristic or not. *Id.* The Court noted that the Department could not know before or at the time of retirement which individual female retirees would in fact live longer than the average male retiree. *Id.* Thus, the Court concluded that the Department's practice of requiring all female employees to make larger contributions than all male employees discriminated against those female employees who did not actually live longer than the average male retiree. The Court stated that this practice violated title VII because it could "not pass the simple test of whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.'" *Id.* at 711, 98 S.Ct. at 1377 (footnote omitted) (quoting *Developments in the Law—Employment Discrimination & Title VII of the Civil Rights Act of 1964*, 84 Harv.L. Rev. 1109, 1170 (1971)).

After concluding that the Department's practice violated title VII, the Court turned its attention to fashioning an appropriate remedy. The Court stated that in *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), it had created a presumption in favor of retroactive liability in order to make the plaintiff whole. 435 U.S. at 719, 98 S.Ct. at 1380. However, the Court concluded that two factors made retroactive liability inappropriate in *Manhart*. First, it noted that there had been wide disagreement as to whether the use of sex-based actuarial tables in calculating pension contributions and benefits violated title VII. *Id.* at 720, 98 S.Ct. at 1381. Second, it cautioned that retroactive liability might endanger the solvency of many employer-sponsored pension plans. The Court indicated that it feared that plan administrators had not foreseen the possibility that the legal rules governing the plans might change, and the plans therefore might not be financially able to adjust to the new rules. *Id.* at 721–23, 98 S.Ct. at 1382. In light of these factors, the Court held that liability should not be imposed retroactively, and remanded the case to the lower courts to fashion a revised award.

The Court was careful to state the limits of its holding. It emphasized that

> [a]lthough we conclude that the Department's practice violated Title VII, we do not suggest that the statute was intended to revolutionize the insurance and pension industries. All that is at issue today is a requirement that men and women make *unequal contributions* to an *employer-operated* pension fund. *Nothing in our holding implies that it would be unlawful for an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command in the open market.*

*Id.* at 718, 98 S.Ct. at 1380 (footnote omitted) (emphasis added).

The Court did not turn its attention to these issues again until six years later when in *Norris* it assessed the legality of a deferred compensation pension plan offered by the State of Arizona to its employees. Unlike the plan at issue in *Manhart*, the plan in *Norris* was not operated by the employer itself; instead, several private companies selected by the State administered the calculation and payment of benefits. These companies offered a variety of investment options to the state's employees, and each employee selected the option that best suited him. After an employee had selected the option he desired, the State simply withheld the appropriate sum from the employee's wages and channelled that money to the appropriate company.

Among the investment options available under the plan was a lifetime annuity. All of the companies selected by the State to participate in the deferred compensation plan used sex-based actuarial tables to calculate annuity benefits. Because these tables showed that, as a group, women live longer than men, the companies paid smaller annuity benefits to women than to men who deferred the same amount of compensation and retired at the same age. A female employee brought suit contending that the companies' use of sex-based actu-

arial tables in calculating annuity payments violated title VII.

*Norris* presented two issues left unresolved in *Manhart.* First, the Supreme Court had stressed in *Manhart* that the plan in question there had required women to make higher contributions than men in order to receive the same benefits. The Court did not address whether a plan that required equal contributions, but paid women lower benefits than similarly situated men, would violate title VII. Since the plan in *Norris* was voluntary, it did not require women to make higher contributions than similarly situated men if they did not chose to do so. But if women did make equal contributions, they received lower annuity benefits than men during retirement.

Second, the Court had stressed in *Manhart* that its holding was limited to "employer-operated" pension plans. It stated that it expressed no view as to whether an employer would violate title VII by withholding equal contributions from men and women and letting its employees invest those sums on the open market. *Norris* did not pose exactly that situation, since the plan there did not permit employees to invest their contributions on the open market, but only in investment opportunities selected by the employer. Nonetheless, the plan in *Norris* was significantly different from the plan in *Manhart* in that it was operated by private companies and only sponsored by the employer.

The Supreme Court divided sharply on the case, but there was little disagreement on the first issue—whether title VII prohibited an employer from offering a plan that required equal contributions from men and women, but paid women lower benefits than men. Justice Marshall, in an opinion joined by Justices Brennan, White, Stevens, and O'Connor, stated:

We have no hesitation in holding, as have all but one of the lower courts that have considered the question, that the classification of employees on the basis

of sex is no more permissible at the pay-out stage of a retirement plan than at the pay-in stage.... If a woman participating in the Arizona plan wishes to obtain monthly benefits equal to those obtained by a man, she must make greater monthly contributions than he, just as the female employees in *Manhart* had to make greater contributions to obtain equal benefits. For any particular level of benefits that a woman might wish to receive, she will have to make greater monthly contributions to obtain that level of benefits than a man would have to make. The fact that Arizona has offered a range of discriminatory benefit levels, rather than only one such level, obviously provides no basis whatsoever for distinguishing *Manhart.*

463 U.S. at 1081–82, 103 S.Ct. at 3497–98 (footnotes omitted) (Marshall, J., concurring in the judgment in part). The balance of the Court, while taking issue with the rest of Justice Marshall's opinion, did not challenge this conclusion.

On the second question, whether title VII was limited only to "employer-operated" pension plans, Justice Marshall wrote for the same majority. The Court held that since the State of Arizona had selected the private companies to administer its retirement plans, the State was legally responsible for any discriminatory terms in the annuities those companies offered to its employees:

Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the State, the State cannot disclaim responsibility for the discriminatory features of the insurers' options. Since employers are ultimately responsible for the "compensation, terms, conditions, [and] privileges of employment" provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of

race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination.

*Id.* at 1089, 103 S.Ct. at 3501. The balance of the Court vigorously disagreed with this conclusion, arguing that title VII was not intended to alter the familiar practices of the insurance industry. *Id.* at 1098–105, 103 S.Ct. at 3506–10. (Powell, J., dissenting in part and concurring in part).

After concluding that the benefit plan violated title VII, Justice Marshall turned to the issue of relief. However, on this point, Justice Marshall did not command a majority of the Court; instead, Justice Powell, in an opinion joined by Chief Justice Burger and Justices Blackmun, Rehnquist, and O'Connor, expressed the majority's views.

The district court, which had also found that the plan violated title VII, had issued an injunction requiring the plan to pay equal benefits to men and women who retired after the date of the district court judgment. While this relief looked to the future, the Supreme Court noted that it was fundamentally retroactive in nature. *Id.* at 1092, 103 S.Ct. at 3503 (Marshall, J., concurring in the judgment in part); *id.* at 1105 n. 10, 103 S.Ct. at 3510 n. 10 (Powell, J., dissenting in part and concurring in part). As Justice Marshall explained, "[t]his is true because retirement benefits under a plan such as that at issue here represent a return on contributions which were made during the employee's working years and which were intended to fund the benefits without any additional contributions from any source after retirement." *Id.* at 1092, 103 S.Ct. at 3503 (Marshall, J., concurring in the judgment in part).

In his majority opinion on this issue, Justice Powell reiterated the general rule that retroactive relief is normally appropriate in a title VII case. He reasoned, however, that a retroactive award was not appropriate in this case for the same reasons the Court had denied such relief in *Manhart.*

First, he noted that while *"Manhart* did put all employer-operated pension funds on notice that they could not 'requir[e] that men and women make unequal contributions to [the] fund,'" the case "expressly confirmed that an employer could set aside equal contributions and let each retiree purchase whatever benefit his or her contributions could command on the 'open market.'" *Id.* at 1106, 103 S.Ct. at 3510 (Powell, J., dissenting in part and concurring in part) (quoting *Manhart,* 435 U.S. at 717, 718, 98 S.Ct. at 1379, 1380). Justice Powell stated that "[g]iven this explicit limitation, an employer reasonably could have assumed that it would be lawful to make available to its employees annuities offered by insurance companies on the open market." *Id.*

Second, Justice Powell argued that holding the State of Arizona and other employers offering similar pension plans liable retroactively could have "devastating results." *Id.* 463 U.S. at 1106, 103 S.Ct. at 3510. As Justice Marshall had explained, the retirement benefits offered by such plans represented a return on contributions, and those contributions were intended to fund the benefits without additional contributions from other sources. And, as Justice Powell noted, if the benefits to be paid to men had already been defined, an employer could not pay women more by paying men less; instead, the employer would presumably have to "top up" women's benefits to match those paid to men. *Id.* at 1106 n. 11, 103 S.Ct. at 3510 n. 11. Justice Powell indicated that the overall cost of such a ruling to the nation's pension plans would be up to $1260 million annually for the next 15 to 30 years. *Id.* at 1106, 103 S.Ct. at 3510. Moreover, the cost of such an award in *Norris* would fall on the State of Arizona, or more specifically, the state's taxpayers. Justice Powell stated that "[t]here is no justification for this Court, particularly in view of the question left open in *Manhart,* to impose this magnitude of burden retroactively on the public." *Id.* at 1107, 103 S.Ct. at 3511. Accordingly, the Court ruled that only benefits derived from contributions made after its decision

would have to be calculated with unisex actuarial tables.

### 2. *Application of* Manhart *and* Norris

■ The State of New York argues that I should decline to award the retroactive relief Graham seeks for the same reasons the Supreme Court found a retroactive award inappropriate in *Manhart* and *Norris.* However, I cannot agree that the Supreme Court's reasoning in those cases is equally applicable here.

As discussed above, the Court emphasized in both cases that the defendants could have reasonably concluded that their actions were lawful given the uncertain state of the law. In *Manhart,* the Court stated that prior to its decision there had been wide disagreement as to whether the use of sex-based actuarial tables in calculating pension contributions and benefits violated title VII. 435 U.S. at 720, 98 S.Ct. at 1381. And in *Norris,* the Court noted that the issues before it had been expressly left open in *Manhart.* 463 U.S. at 1086, 103 S.Ct. at 3500 (Marshall, J., concurring in the judgment in part).

But while *Manhart* did not purport to answer all questions relating to the use of sex-based actuarial tables in calculating retirement benefits, it did make certain rules clear. One of them was that employers could not require women to make larger contributions than men in order to receive the same benefits as men. One might argue that that is what New York did in converting accrued-but-unused sick leave into a credit against health insurance premiums. In order for a woman to receive the same credit as a similarly situated man, she had to "contribute" more unused sick days than the man. *Manhart* plainly put the State on notice that this practice violated title VII.

But even if the State's system of converting sick leave into a credit is viewed not as requiring larger contributions from women to obtain the same benefits as men,

but rather requiring equal contributions and giving smaller benefits, the Supreme Court made clear in *Norris* that this was no basis for distinguishing *Manhart.* Indeed, nearly every lower federal court that had considered it, including the Court of Appeals for the Second Circuit, rejected the suggestion that these two alternatives were somehow different. *Norris,* 463 U.S. at 1081 n. 9, 103 S.Ct. at 3497 n. 9 (Marshall, J., concurring in the judgment in part) (citing cases). Indeed, our court of appeals stated in *Spirt v. Teachers Insurance & Annuity Ass'n,* 691 F.2d 1054, 1061 (2d Cir.1982), *vacated and remanded,* 463 U.S. 1223, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983), *decision on remand,* 735 F.2d 23 (2d Cir.1984), *cert. denied,* 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984), that if there was any meaningful distinction between these two types of sex-based plans, an equal contribution, unequal benefit scheme was "more in conflict with the spirit and purposes of Title VII." Thus, it seems clear that the State should have recognized that its practice, whether viewed as discriminating at the "pay in" or "pay out" stage, was impermissible when *Manhart* was decided.

Similarly, the State can take no refuge in the second question *Manhart* left open— whether title VII applied only to employer-operated plans—since the State's plan is an employer-operated plan. The principal issue *Manhart* left unresolved was whether title VII would prohibit an employer from setting aside equal contributions and letting each employee purchase benefits on the open market. The State's scheme for converting unused sick leave into a credit against health insurance premiums bears no resemblance to such a plan.

The second factor the Court cited in *Manhart* and *Norris* for denying retroactive relief was the possibility that the additional cost would fall on innocent third parties. In *Manhart,* the Court noted that retroactive liability might threaten the solvency of many plans and lay the harm directly on the beneficiaries themselves,

and in *Norris*, it stressed that the very great burden of retroactive relief would fall on the taxpaying public.

Not surprisingly, the State of New York relies heavily the Court's concern in *Norris* that the cost of retroactive relief would constitute an unreasonable burden on the public.

But the Supreme Court's statements in that case must be placed in context. First, the Court obviously was not saying that a court must deny a title VII plaintiff the relief necessary to make her whole whenever the cost of that relief will have to be borne by a public treasury. It is beyond dispute that a title VII plaintiff is entitled in appropriate circumstances to recover retroactive relief from a state government. *See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (eleventh amendment does not bar a backpay award under title VII). Second, the Court stressed in *Norris* that one of the reasons retroactive relief was particularly inappropriate there was because the state of the law was uncertain. Justice Powell concluded his opinion by stating that "[t]here is no justification for this Court, *particularly in view of the question left open* in *Manhart*, to impose this magnitude of burden retroactively on the public. 463 U.S. at 1107, 103 S.Ct. at 3511 (Powell, J., concurring in part and dissenting in part) (emphasis added). Finally, the Court in *Norris* was obviously troubled by the extremely large cost of retroactive relief in that case.

None of these factors counsels against retroactive relief in the circumstances of this case. First, as the Court reiterated in *Manhart* and *Norris*, the decision in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), creates a presumption in favor of retroactive relief in title VII cases. Contrary to the State's suggestion, *Manhart* and *Norris* do not purport to do away with that presumption in cases involving pension or retirement plans. Indeed, our court of appeals

reaffirmed its decision to award retroactive relief in *Spirt v. Teachers Insurance & Annuity Ass'n*, 691 F.2d 1054 (2d Cir. 1982), *vacated and remanded*, 463 U.S. 1223, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983), *decision on remand*, 735 F.2d 23 (2d Cir.1984), *cert. denied*, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984), after the Supreme Court had vacated the court's previous decision for reconsideration in light of *Norris*. Second, the State in this case cannot seriously contend that the state of the law was uncertain or ambiguous. As discussed earlier, *Manhart* should have made it clear to the State in 1978 that its practice of using sex-based actuarial tables was illegal. Under such circumstances, there is no reason to excuse the State's discriminatory practices.

For all of these reasons, I conclude that there is no bar to retroactive relief in this case. However, the State argues that even if the members of the proposed class are entitled to a retroactive award, their credits should be recalculated using unisex actuarial tables rather than the male tables used to calculate the credits for men who retired during the same period. The State argues that in light of *Norris*, "the amounts formerly paid to men based on male actuarial tables must now be viewed as a windfall. To grant women retirees an equivalent windfall goes well beyond making them whole." Defendants' Reply Memorandum of Law at 6.

This argument misses the very essence of the Supreme Court's recent decisions. I agree that, when viewed in hindsight, the amounts formerly paid to men must be considered a windfall. But if *Manhart* and *Norris* teach anything, it is that employers must not discriminate on the basis of sex. They must pay similarly situated men and women the same retirement benefits. Thus, if the State gave men a "windfall," it had to give women the same "windfall." In short, since the State used male actuarial tables to calculate the credits given to

**1372**

men who retired during the period in question, it must use the same tables to calculate the *past* credits for women.

 However, with respect to *future* credits to be given to male and female employees who retired during this period, there appears to be no reason why the credits for both men and women cannot be recalculated using unisex actuarial tables. This approach has two benefits. First, it would give retired female employees no more and no less than what they would have received if the State had converted to unisex tables after *Manhart* was decided, as Graham argues, and I agree, it should have been done. And, second, this approach would ameliorate the State's expense in remedying the situation. There is no dispute that the amounts previously paid to men based on male actuarial tables constituted a windfall for them, and will now generate an even greater windfall for women. There is nothing that can be done about recovering these unnecessary expenditures since the credits have already been paid to the men, and for all of the reasons discussed above, the women are entitled to the same credits that the men received. There is, however, no just reason to extend this anomaly into the future at the taxpayer's expense when it can be easily corrected by recalculating both men and women's credits with unisex tables. This will give both men and women the amount of credit they would have received if the State had converted to unisex tables in the wake of *Manhart*. Of course, it will mean that men's credits will be reduced somewhat, which may give retired male employees cause for complaint. But there is nothing in the record before me that suggests that those male employees have a vested right to a credit based on male actuarial tables; indeed, the fact that the State converted to unisex tables in 1983 suggests that they do not.

*Conclusion*

For the foregoing reasons, I conclude that Graham is entitled to a retroactive award of the difference between the past credits she received and the past credits her male counterparts received. However, with respect to future credits, the State will be directed to recalculate both men and women's benefits using unisex actuarial tables. Accordingly, plaintiff's motion for summary judgment is granted, and defendants' motion for summary judgment is denied.

The parties are directed to agree upon a proposed final judgment, in accordance with this Opinion, reserving the right to appeal the issue of retroactivity, to be submitted by March 31, 1987.

SO ORDERED.